**Kim ADAMS, et al., Plaintiffs,**

v.

**INDIANA BELL TELEPHONE COMPANY, INC. and Ameritech Services, Inc., Defendants.**

**No. IP 93–0420–C M/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 23, 1998.

---

Mark A. Waterfill, Leagre Chandler & Millard, Indianapolis, IN, David L. Rose, Law Office of David Rose, Washington, DC, C. Warren Holland, Holland & Holland, Indianapolis, IN, for Plaintiffs.

Michael Bergin, Ariane S. Johnson, Locke Reynolds Boyd & Weisell, Lee B. McTurnan, Wayne C. Turner, Jacqueline B. Ponder, Steven M. Badger, McTurnan & Turner, R. Anthony Prather, Ameritech Indiana Law Dept., Indianapolis, IN, for Defendants.

## ORDER ON MOTIONS TO STRIKE AND FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

Currently pending before the Court are two dispositive motions on the claims of the plaintiffs brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as several related motions. The plaintiffs have raised both individual and pattern or practice claims of age discrimination, which they maintain occurred during a corporate-wide resizing process in 1992 and 1993 at Ameritech Services, Inc. ("ASI"). The related motions are three motions to strike the evidence plaintiffs plan to offer through their statistics, labor economics, and industrial psychology experts. If granted, the motions to strike will have the effect of excluding a substantial portion of the evidence on which plaintiffs rely in opposition to the pending summary judgment motions. Thus, the Court will first address the issues raised by these motions.

### I. MOTIONS TO STRIKE

#### A. STANDARDS

According to Rule 12(f) of the Federal Rules of Civil Procedure:

[U]pon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Generally, motions to strike are considered a drastic remedy, and are strongly disfavored. *Federal Nat'l Mortgage Ass'n v. Cobb,* 738 F.Supp. 1220, 1224 (N.D.Ind.1990); *see also New York v. Almy Brothers, Inc.,* 971 F.Supp. 69, 72 (S.D.N.Y.1997). Accordingly, such motions "are ordinarily not granted unless the language in the pleading at issue has no possible relation to the controversy and is clearly prejudicial." *Cobb,* 738 F.Supp. at 1224.; *Abdulrahim v. Gene B. Glick Co.,* 612 F.Supp. 256, 260 n. 1 (N.D.Ind.1985). A trial court, however, clearly has discretion to grant a well-taken motion to strike. *Mirshak v. Joyce,* 652 F.Supp. 359, 370 (N.D.Ill. 1987). In exercising that discretion, the Court must consider the value of the pleading in light of other rules of procedure.

Rule 56(e) requires that affidavits supporting or opposing a motion for summary judgment set forth facts that would be admissible in evidence, and show "affirmatively that the affiant is competent to testify to the matters" presented. Fed.R.Civ.P. 56(e). Courts may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *Id.* Although the evidence presented in opposition to or support of summary judgment does not have to be in admissible form, it must be admissible in content. *See Winskunas v. Birnbaum,* 23 F.3d 1264, 1267–68 (7th Cir.1994) (evidence must be of "evidentiary quality," meaning that a change in form but not in content would make the evidence admissible at trial). Examples of such evidence include certified documents or sworn testimony, such as depositions or affidavits. *Id.* at 1267.

To be admissible, testimony must be relevant to the facts the party intends to prove under the legal theory that has been chosen to support the party's claim. *See* **Charles A. Wright & Kenneth W. Graham, Federal Practice And Procedure:** Evidence § 5162. "Relevance is a relationship between the evidence offered and the fact it is supposed to prove." *Id.* A piece of evidence may be excluded as irrelevant in one of two ways. First, it may provide satisfactory proof of a fact in dispute, but the fact for which it is offered is not a material fact in the case. *Id.* Second, it may be directed at a material fact, but not have any value as proof of that fact. *Id.* A material fact is a "fact that is of consequence to the determination of the action." Fed.R.Evid. 401.

## B. RELEVANCE AND MATERIALITY

### 1. Relevance

▆▆▆▆ Relevant evidence is evidence that has any tendency to make the existence of a fact of consequence to the determination of the matter (*i.e.* "material fact") more probable or less probable than it would be without the evidence. Fed.R.Evid. 401. The term "any tendency" is so broad that it has the effect of allowing admission of evidence that has only the slightest bit of probative worth. **Charles A. Wright & Kenneth W. Graham, Federal Practice** § 5165. In fact, the Seventh Circuit has called the definition of relevance under Rule 401 "expansive." *United States v. Pollard,* 790 F.2d 1309, 1312 (7th Cir.1986), *overruled on other grnds. by United States v. Sblendorio,* 830 F.2d 1382 (7th Cir.1987). Generally, all relevant evidence is admissible, and irrelevant evidence is inadmissible. Fed.R.Evid. 402. The weight of the evidence, however, is for the jury to decide. Judges may not weigh the evidence when determining its relevance. Thus, arguments about the quality or probative value of the evidence advanced to defeat its admissibility are inapplicable to the inquiry.

▆▆▆▆ Once it is found to be relevant, some evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, if it brings about confusion of the issues, or if it is misleading for the jury. Fed.R.Evid. 403. It is in this process that the judge may weigh the evidence. Rule 403 presumes a finding that the evidence in question makes some fact in dispute more or less probable. If not, the court may not consider it under Rule 403. By probable it is meant "uncertain, but likely to be true." **Wright & Graham** § 5165. The court measures probative value by weighing

the evidence in terms of its relationship to the truth or falsity of propositions of fact sought to be proved. *Id.*

Rule 403 recognizes the discretion of a judge to exclude evidence, but seeks to limit the exercise of that discretion. *Id.* § 5212. Even though the court's role in determining admissibility is limited, it must "weigh" the evidence to determine if its probative value exceeds any procedural problems it creates. *See* **Wright & Graham** § 5165. In doing so, the judge must be careful not to usurp the role of the jury under the guise of determining probative value. A judge may exclude evidence only after balancing the "competing considerations" listed in the rule and finding that the procedural harm caused by the evidence substantially exceeds its probative value. *Id.*

■ It is this balancing or weighing that furthers the policy behind Rule 403 of limiting judicial discretion in the admission and exclusion of evidence. *Id.* § 5214. The probative value of the evidence must be substantially outweighed by its prejudicial effect, or by the danger that it might mislead or confuse the jury, before the court would have discretion to exclude it. *Id.* If the balance goes against the probative worth of the evidence, the court may, but is not required to, exclude the evidence. *Id.* Thus, application of Rule 403 involves a two-step process: balancing, then exercising discretion.

■ When balancing evidence, the court should be mindful of the nature of the evidence. For example, evidence that proves an ultimate fact without any inferential step, except for a credibility determination, is deemed at this stage to be more probative than evidence that would require an inference to be drawn before the ultimate fact may be supported. *Id.* § 5214. The weighing process under Rule 403 requires the judge to assume the credibility of a witness, because to do otherwise would usurp the jury's function. *Id.* Thus, the probative worth of eyewitness testimony as to an ultimate fact is presumed to be 100%. *Id.* Nevertheless, very little evidence is of such caliber. More often a witness or document provides circumstantial evidence, or evidence that requires an inferential step before it can prove an ultimate fact. Some evidence may require several inferential steps, which lessens its probative value over evidence requiring none or one. Evidence that requires an inference before it can prove a material fact may be countervailed by offerings of the other party that make the inference less reasonable.

Probative value is not a precise mathematical term. *Id.* Rather it is a reflection of the economic concepts of supply and demand. *Id.* The need for the evidence is assessed against the possible supply of alternative means of proving the fact. *See id.*

### 2. *Materiality*

■ Evidence may be entirely relevant to an issue in dispute, but the issue itself may not be material to the action. Such evidence would be deemed irrelevant, but on the basis of the lack of materiality of the ultimate fact it is intended to prove. Materiality is determined with reference to the substantive law being applied, and it depends on the legal theories the plaintiffs seek to employ to support their claims.

Here, the plaintiffs have brought their claims under the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. §§ 621 *et seq.* The ADEA provides in part:

the purpose of this chapter [is] to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment;

\* \* \* \* \* \*

It shall be unlawful for an employer—(1) to discharge any individual or otherwise discriminate against any individual ... because of such individual's age; (2) to limit, segregate, or classify employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;

\* \* \* \* \* \*

It shall not be unlawful for an employer ... (1) to take any action otherwise prohibited ... [in] this section where age is a bona fide occupational qualification ... or

where the differentiation is based on reasonable factors other than age ....

29 U.S.C. §§ 621(b), 623(a)(1), 623(a)(2), 623(f)(1).

Employees may enforce the ADEA against their employer either in their individual capacities or as nominal plaintiffs in an opt-in class action. *See* 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b) by reference); *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.), *cert. den.,* —— U.S. ——, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996). The employees here have done both. To state an individual claim for age discrimination under the ADEA, plaintiffs must offer direct evidence of discrimination, or use the indirect, burden-shifting, method of proof described in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Using the direct method, a plaintiff may prove discrimination by providing evidence that the fact-finder may interpret as the employer's acknowledgment of discriminatory intent. *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 396 (7th Cir.1997). For it to succeed, such evidence must clearly demonstrate the motivation of the person who made the contested employment decision. *Id.* (citing *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir.1996)). To succeed on the individual age discrimination claim, a plaintiff must prove that age was the determining factor in that decision. *Id.*

That task is more difficult in the context of a corporate-wide workforce resizing and restructuring, as happened here. *See Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 889 (7th Cir.1997); *Testerman v. EDS Technical Products Corp.,* 98 F.3d 297, 303–04 (7th Cir.1996) (in a case involving a reduction in force ("RIF"), a claimant must show that age "tipped the balance" in favor of his or her discharge). When an employer must reduce its workforce, "it is foreordained that some employees will lose their jobs; and ... the defendant inevitably will be able to point to some imperfection as a reason for the discharge." *Testerman,* 98 F.3d at 304. However, if the employer fires an older employee who would otherwise have survived the RIF but for his age, the ADEA is violated. *Id.* In this context, the court must deal with "small gradations, with an employer's subjective comparison of one employee to another, and

it is incumbent upon [the court] to remember that what is at issue is not the wisdom of the employer's decision, but the genuineness of the employer's motives." *Id.*

In *Chiaramonte,* the plaintiff attempted to prove motivation of the decision-maker, president John Elting, by offering evidence of statements made by the company's chief executive officer, John Singer. *Chiaramonte,* 129 F.3d at 396. Singer allegedly told Chiaramonte that "age had to be a factor" in the decision to terminate him. *Id.* at 397. However, Chiaramonte had no evidence that Elting and Singer had discussed the reasons for Chiaramonte's termination, nor could he provide evidence that Elting made statements that could be interpreted as age-related animus. *Id.* Elting's deposition testimony indicated that he was the sole decision-maker, although he does not unambiguously deny having discussed the decision with Singer. Singer, however, unequivocally denied discussing the decision with Elting. *Id.* "Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to [the] inquiry." *Id.*

Chiaramonte also offered as evidence of discrimination comments made by Debbie Lunn, a lower-level supervisor, that the company planned to get rid of "all you old people." *Id.* Lunn, who often socialized with Elting, denied making the statement. *Id.* Even if she had, it would have no probative value the court said, because Lunn had no control over the decision to discharge Chiaramonte. *Id.* "[A]ctions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Id.*

 If an employee cannot provide direct evidence of discrimination, he or she may adopt the traditional burden-shifting method of proof. However, the *McDonnell Douglas* method is not an "efficient formula" for large-scale workplace restructuring cases. *Hartley,* 124 F.3d at 889. Ordinarily, this approach is based on the legitimate assumption that the plaintiff was doing fine in his or her job, then lost it, and was replaced by someone younger, or white, or male, or not disabled. *Hartley,* 124 F.3d at 889. Apply-

ing that rationale to a RIF case is problematic because it "ignores the circumstances surrounding [the] termination and it presumes [the plaintiff] was singled out for termination." *Id.* When an employer must reduce its workforce, employees who were doing fine in their jobs may lose them. *Id.; see also Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 943 (7th Cir.), *cert. den.,* — U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997). Nevertheless, adapting this method to the RIF context, an employee may establish a prima facie case by showing:

1. Membership in a protected age group;
2. Satisfactory job performance;
3. An adverse employment action, such as a discharge; and
4. That substantially younger, similarly-situated employees were treated more favorably.

*Chiaramonte,* 129 F.3d at 398 (citing *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)).

By establishing these elements of a prima facie case of age discrimination, the employee shifts the burden of production to the defendant, who must come forward with a legitimate, non-discriminatory explanation for the decision. Provided that the defendant succeeds in meeting this obligation, the presumption of discrimination created by the prima facie case is rebutted. The burden then shifts back to the plaintiff to prove that the employer's stated reasons are pretextual, either by showing that they are unworthy of credence or that a discriminatory reason more likely motivated the decision. *Id.* The ultimate burden of persuasion on the issue of discrimination, however, always lies with the plaintiff. *Id.*

■ A crucial difference in a RIF case, is that the defendant can meet its burden of production by explaining the reasons behind the downsizing and the process used to select employees for discharge. Thus, the burden quickly returns to the plaintiff to show that those reasons were a pretext for discrimination, or that the process was deliberately designed to weed out older workers. Unlike an age discrimination case when no reduction in force occurred, the question is not whether the employee was or was not performing

satisfactorily, but whether the employer "honestly believed that [the plaintiff] was the weakest member of the department." *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995). Plaintiffs lose at the pretext stage if the court finds that the defendant "honestly believed in the nondiscriminatory reasons it offered, even if those reasons are foolish or trivial or even baseless." *Hartley,* 124 F.3d at 890.

■ Another difference in the RIF context is seen when plaintiffs sue on behalf of those similarly situated based on an alleged pattern or practice of age discrimination. In that context, the prima facie case is established by showing that unlawful discrimination has been the company's standard operating procedure, the regular rather than the unusual practice. *EEOC v. Chicago Miniature Lamp Wks.,* 947 F.2d 292, 297 (7th Cir.1991); *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985). It usually consists of "statistical evidence demonstrating substantial disparities in the application of employment actions as to ... the protected group, buttressed by evidence of general policies or specific instances of discrimination." *Coates,* 756 F.2d at 532 (citing *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 360, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Evidence of discrimination against particular individuals may form part of the proof for a pattern or practice claim. However, to elevate individual claims to the level of a pattern or practice case requires evidence that the discriminatory treatment is typical of the employer's employment practices, or that those practices are motivated by a policy of discrimination against the protected class that pervades the entire business. *King v. General Elec. Co.,* 960 F.2d 617, 623 (7th Cir.1992). Another way to satisfy the evidentiary requirement would be to show that a policy of discrimination that is reflected in the employer's other employment practices, is the same as reflected in the practice at issue. *Id.* The employee must prove by "significant evidence" the regular, purposeful, less-favorable treatment of members of a protected group. *Id.*

Once a pattern or practice prima facie case is established, the burden shifts to the defendant to show that the plaintiff's statistical proof is inaccurate or insignificant, or that a nondiscriminatory explanation exists for the disparity. *Coates,* 756 F.2d at 532–33. The strength of the evidence needed to accomplish this depends on the strength of the plaintiff's proof. *Id.* Interestingly, a defendant has two possible courses of action open for rebutting the prima facie case. First, it may offer proof that negates the pattern or practice, such as evidence of the inaccuracy or invalidity of the plaintiff's statistics. *Id.* In fact, the most effective way to rebut a statistically-based prima facie case is to offer more accurate statistics. *Id.* at 544. By offering statistics that include an omitted factor and showing that the statistics no longer indicate discrimination, a defendant shifts the burden back to the plaintiff. Likewise, a defendant may offer a non-discriminatory explanation for the apparently discriminatory overall result. *Id.* at 537. Second, the defendant may proffer a legitimate non-discriminatory reason for the employment decision made with respect to each class member. *Coates,* 756 F.2d at 533. Offering a non-discriminatory reason only for the discharge of each named plaintiff will weaken, but not destroy, the class action for a pattern or practice of discrimination. *Id.*

In light of these burdens and using the direct method to prove either type of claim, the material facts a plaintiff must prove include those that tend to show the employer's intent or motivation. These could be discriminatory statements or comments made by the decision-maker, or attributed to the decision-maker, or those made by others to which the decision-maker has agreed. Likewise, circumstantial evidence, such as a statistical imbalance in the employer's workforce, can be material to the inquiry under the direct method of proof. *See Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 450 (7th Cir.1991), *cert. den.,* 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992) (describing four methods of proving employment discrimination).

However, under the indirect method for individual claims, the material facts are those tending to prove each of the elements of the prima facie case as they relate to an individual plaintiff. Also material is the defendant's explanation for the decision against each plaintiff and evidence about the plaintiff's allegations of pretext. For example, evidence that similarly-situated, but substantially younger, workers were retained for the same types of jobs the plaintiffs had been performing would be material to an indirect method of proof.[1] Likewise, direct evidence of a contradiction between the employer's expressed justification for a decision and documentation created at the time of the decision would be material to the pretext inquiry. *Perfetti,* 950 F.2d at 451. Circumstantial evidence of pretext, such as showing that a proffered justification was not a genuine job requirement, or that the criteria or rules were inconsistently applied to others, would also be material. *Id.*

The framework for the indirect method of proof in the pattern or practice type of claim is comparable to that in *McDonnell Douglas,* except the content of the specific stages will be different. *Coates,* 756 F.2d at 533. For example, the focus in the class action is on a pattern of discriminatory decision-making. *Id.* This means that specific allegations of individual discrimination may be material, but not unless the number of instances is significant. *Id.* On the other hand, strong statistical evidence of a pattern of discrimination may be rebutted with more accurate statistics. Once a prima facie showing is made, each class member will benefit from a presumption of discrimination for their individual claims, which must be rebutted separately by the defendant. *See King,* 960 F.2d at 623; *Coates,* 756 F.2d at 532. However, the defendant may rebut a class pattern or practice prima facie case with evidence showing a non-discriminatory reason for the overall disparity, or by challenging the statistics.

---

1. However, in a RIF case a plaintiff usually cannot show he or she was "replaced," which changes the type of evidence needed. Instead, a RIF plaintiff has to show more favorable treatment of a substantially younger employee.

## C. RELIABILITY AND USEFULNESS

In addition to being relevant and material, scientific or other specialized evidence must also be reliable before it can be admitted into evidence. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court established a standard for determining the admissibility of scientific evidence and expert testimony. *Bradley v. Brown*, 42 F.3d 434, 437 (7th Cir.1994); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.), *cert. den.*, 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994). To assist district courts with assessing reliability, the Court set up a framework of analysis that fits into the preliminary analysis of evidence required by Rule 104.

### 1. Daubert Standard

■ Under the federal rules of evidence, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence and determine the facts in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise. Fed.R.Evid. 702. Under the *Daubert* framework, the court must assess whether the expert is qualified and will testify to reliable scientific knowledge that is helpful to the trier of fact. The witness is qualified as an expert by "knowledge, skill, experience, training or education," and the expert's testimony will be helpful if, among other things, it is relevant. The latter inquiry corresponds to the relevance determination made with respect to non-technical or scientific evidence under Rule 401. If an expert's testimony is not based on reliable scientific knowledge, or if it is based on such knowledge but fails to relate to any material facts, then it is not useful. If the expert's testimony is not helpful, it is not relevant.

■ The reliability of scientific knowledge is assessed in relation to this non-exclusive list of factors:

1. whether a theory or technique can be or has been tested;

2. whether a theory or technique has been subjected to peer review and publication;

3. the known and potential rate of error; and

4. the "general acceptance" of the theory or technique.

After this preliminary assessment of the scientific validity of the evidence to be offered, the court determines whether the reasoning or methodology properly can be applied to the facts in issue (that is, whether it fits the facts). *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786; *Bradley*, 42 F.3d at 437.

■ Even before *Daubert* the Seventh Circuit had discussed the proper use of expert witness testimony. *See Mid–State Fertilizer v. Exchange Nat'l Bk.*, 877 F.2d 1333 (7th Cir.1989). That discussion guides the court's assessment of whether the testimony will be useful to the factfinder. Applying Federal Rule of Evidence 705, the court may allow an expert to present "naked" opinions. *Id.* at 1339. Admissibility, however, does not mean utility. *Id.* With fact witnesses, to overcome a summary judgment motion a proffered affidavit must "set forth facts" that would be admissible. Fed.R.Civ.P. 56(c). In the case of an expert witness (who is a nonfact witness), the affidavits or reports should set forth "a process of reasoning beginning from a firm foundation." *Mid–State*, 877 F.2d at 1339. Expertise is a rational process, and a "rational process implies expressed reasons for judgment." *Id.* (citing *FPC v. Hope Natural Gas*, 320 U.S. 591, 627, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Moreover, an opinion is only as good as the sources behind it. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* This is especially true when the opinion makes no sense in light of the circumstances. Judges must look behind an expert's ultimate conclusion and analyze the adequacy of its foundation. *Id.* at 1339. If the factual context makes the claim implausible, then the plaintiff must provide more persuasive evidence than would otherwise be necessary. *Id.*

■ Only after discerning the reliability and usefulness of the proffered evidence, will the court balance its probative value against the danger of a prejudicial effect, confusion of the issues, or other factors found in Rule 403. Even though an expert may be quali-

fied to testify about the results of some scientific study, and the study might prove helpful to the jury, the court may exclude the testimony if it finds that the evidence is of so little probative value that the prejudicial effect will substantially outweigh it. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound: It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Finally, if the court is satisfied that the evidence is relevant, reliable, and admissible, it will then consider the evidence as a whole to determine if it suffices to raise a genuine issue of material fact for trial.

■ The court's role in determining admissibility of scientific or other technical evidence is that of a gatekeeper. *General Elec. Co. v. Joiner*, ─ U.S. ─, ─, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *Daubert*, 509 U.S. at 589, n. 7, 113 S.Ct. 2786. It performs that role by examining the methodology and reasoning behind the expert's opinion, in the context of his or her conclusions, which are not "entirely distinct" from methodology. *Joiner*, 118 S.Ct. at 523.

Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the [bare assertion] of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir.1992)). The district court in *Joiner* had done precisely that, and the Supreme Court ruled that it was error for the Eleventh Circuit Court of Appeals to reverse that finding. *Id.* 118 S.Ct. at 519.

■ Further, *Daubert* does not say that a "failure to adhere to the customary methods for conducting a particular kind of scientific inquiry is *irrelevant* to the admissibility of the scientist's testimony. On the contrary, ... it is relevant." *Braun v. Lorillard Inc.*,

84 F.3d 230, 235 (7th Cir.), *cert. den.*, ─ U.S. ─, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996). If an expert departs from the generally accepted methods in her field, the court may appropriately insist that the departure be grounded in "demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry." *Id. Braun* was a case in which the plaintiff's attorney hired an expert who specialized in detecting asbestos in buildings, after the experts he had hired who specialized in detecting it in humans had failed to achieve the desired results. *Id.* The court stated that this is the kind of abuse *Daubert* sought to prevent. *Id.*

■ In sum, as the Seventh Circuit recently noted, courts must determine if the proffered evidence is "genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.), *cert. den.*, ─ U.S. ─, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996). This does not mean that judges must determine the essence of "real" science. Instead, "the goal is to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Id.* at 318.

### 2. *Use of Statistics*

■ Statistical evidence is a type of "other specialized knowledge" that may be useful in a discrimination case, but only when the quality of the data can be verified. See **Federal Judicial Center, Reference Manual on Scientific Evidence** 341 (West Pub.1994). That is because "statistics are so manipulable that some skepticism may be justified" when they are offered in the evidentiary context. *Coates*, 756 F.2d at 529. Verification involves determining if the measurement process was reliable and valid, and whether the measurements were recorded accurately. **Manual on Scientific Evidence** 341. Reliable statistical evidence is that which was obtained from a measure or model that produces consistent results that can be reproduced repeatedly. *Id.* The measuring instrument or model should be capable of being validated, that is, there must be some independent and highly accu-

rate way of measuring the variable being analyzed. *Id.* at 342. For example, the validity of an employment test is measured by comparing the results to actual job performance. Finally, the data must have been recorded properly, with no gaps or mistakes present. *Id.* If gaps or mistakes exist, they should appear randomly so as not to distort the results. *Id.*

When all of these conditions are met, the measuring device has been verified, but it still must be applied to the correct data. "Statistical analysis appears to be a science and, when properly and fairly used, it can be of great assistance to the factfinder." *Coates,* 756 F.2d at 539. Thus, it is important to determine how the data to be measured has been selected and whether there is any evidence of selection bias. For example, "[a] census measures some characteristic of every unit in a *population* of individuals or objects." **Manual on Scientific Evidence** 343 (emphasis in original). With this measure, it is the population that is selected. As a type of observational study, a census yields useful results only when the population is relevant to the inquiry for which the statistical analysis is being performed. *See id.* at 343. Moreover, the analysis of census results may be affected by the omission of some units from the population. *Id.* If this occurs, the expert should ask whether the missing data is likely to differ in some systematic way from the data actually measured. *Id.* If so, a supplemental study may be necessary.

Parties often attempt to prove causation by using statistical associations identified in an observational study. The associations among variables are expressed as percentages, proportions, ratios, correlation coefficients or slopes of regression lines. **Moore's Federal Practice Reference Manual on Scientific Evidence** 362 n.96 (Fed.Jud.Ctr. 1995). Even though an association is identified, however, there is a second issue: is the association causal? *Id.* Thus, identifying an association is only the first step.

To explore a possible cause and effect relationship further study is required. The investigator should then observe the effect on one variable, the dependent variable, of manipulation of another, an independent variable. *Id.* at 348. Independent variables rep-resent the possible "causes" of the "effect" being studied. If the study does not contemplate the results of manipulating various independent variables, it does little to prove causation. That is because the real cause of the observed results may be variables other than the one with which the dependent variable is associated. When an association is identified among variables, a controlled experiment will help identify which independent variable caused the effect. In fact, this is the best way to eliminate other variables as possible causes of observed associations. *Id.* at 347. If a controlled experiment is not conducted, then the investigator should at least measure the group in which the effect occurred against a comparable group in which the effect is not expected or observed. *See id.* at 349. The key to success, however, is that the second group actually be comparable.

Another issue that arises with observational studies is that the investigator has no control over who or what is observed. *Id.* at 350. Thus, a controlled experiment is precluded, and the investigator should attempt to control for "potentially confounding variables," such as socioeconomic status, education, or worsening economic conditions. *Id.* at 351. A confounding variable is one that is correlated with both the dependent and independent variables, making it difficult to discern which variable has caused the effect in the dependent variable. *Id.* at 348. Without collecting data on the confounding variable, or controlling for other factors that may influence the outcome, the investigator is unable to draw any conclusions about causation from the associations among variables. *Id.* at 348, 352. When an association is found using different studies, or the same study and different groups, the results of the observational study provide more useful evidence. *Id.* at 351. This is because the other studies control for the possibility that the association is due to some defect in the study itself or a peculiarity among group members. *Id.*

Alternatively, an observational study could be useful if the association among variables holds true even when the investigator takes into account, by appropriate statistical techniques such as comparing smaller, homogeneous groups, the effects of

plausible confounding variables. *Id.* Finally, observational studies may provide useful information when there is also a plausible explanation for the effect of the independent variable. In that case, the causal link does not depend only on the association between the independent and dependent variables. *Id.* at 352. If the explanation for linking the dependent variable's response to other variables is less plausible, it is possible to conclude that the independent variable being tested is the cause of the response. *Id.*

When none of these methods of validating an observational study have been used, experts will tend to disagree about the study's interpretation. *Id.* Ultimately, deciding whether associations are causal is not a matter of statistics, but of good scientific judgment. *Id.* If the data comes from an observational study, the court should inquire about how the units that were studied were formed, whether they are comparable, what are, and what are the factors correlated with, the independent variables, what adjustments were made to account for those factors, and were those adjustments sensible. *Id.* Only with satisfactory responses to these inquiries can a court be sure of the reliability of statistical evidence from observational studies in proving causation.

### D. ANALYSIS

 Plaintiffs offering scientific or technical evidence have the burden of establishing the qualifications of the experts, the reliability of their testimony, its relevance, and its usefulness to the jury. *Daubert,* 509 U.S. at 587 n. 10, 113 S.Ct. 2786 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). The defendants have challenged the admissibility of a report and testimony from Dr. Richard Wertheimer ("Wertheimer"), a labor economist that plaintiffs plan to offer as an expert witness, under the *Daubert* standards. According to the defendants,

Wertheimer's statistical analyses are flawed to the point of inadmissibility, in part because he combined all managers at ASI, regardless of job function, experience, education, or skills, when measuring the number of older workers that were selected for termination relative to the number of younger ones selected. By doing so, defendants argue, he treated non-fungible managers as interchangeable, possibly skewing the results. In addition, defendants assert that Wertheimer failed to control for any variable other than age in his statistical study, he compared the ASI workforce to a dissimilar "U.S. Workforce," and he varied the methods used to achieve the results his clients sought.

However, plaintiffs have strongly disagreed with defendants about whether Wertheimer improperly aggregated statistics about non-fungible managers at ASI. According to the plaintiffs, this type of challenge goes to the probative value of the statistical evidence, not its admissibility. They argue that because part of their ADEA claims depend on proof that a pattern or practice of age discrimination was present, Wertheimer's pooling of all the CRESP[2] selection process results provides probative evidence on that issue.

In addition, defendants claim that Wertheimer's subsequent report, filed within thirty days of their experts' reports, was "unauthorized" because it violated the terms of the case management plan and Fed. R.Civ.P. 26(a)(2)(C). According to the defendants, this report contains new opinions based on evidence that was in the possession of the plaintiffs at the time of the original report. The new report includes analyses of selection rates based on salary grades and vice-presidential groups in support of plaintiffs' contention that the gross disparities in selection rates between those over and those under forty occur even when you look at subgroups.[3] *See* Pls.' Ex. 57, Wertheimer's Rebuttal Report. Wertheimer's rebuttal re-

---

2. CRESP is an acronym for "Company re-sizing Plan." Pls.' Ex. 7, CRESP Manual.

3. According to plaintiffs, "[e]ven within CRESP groups, there is a clearly discernable pattern of age discrimination." Pls. Mem. In Oppos. To Mot. To Strike at 12. In his response, Wertheimer analyzed the CRESP group selection rates noted in McCabe's report, and found that of the

eighty-nine CRESP groups in which there was a difference (regardless of whether it was statistically significant) between selection rates of older versus younger workers, the rate was higher for older workers in sixty-nine. Pls.' Ex. 57, Wertheimer Rebuttal Report at 4–5, ¶ 9. That result differs from what one would expect, Wertheimer states, if the selection process were "age neu-

port was filed on May 2, 1996, more than one year after his initial report. Defendants object to consideration of this report because it came after the final date listed in the case management plan for expert witness discovery.[4] However, the rebuttal report was filed within days of the last expert discovery deposition, and more than thirty days before defendants' deadline for filing dispositive motions. It appears to be a response to challenges raised by defendants' experts regarding Wertheimer's initial report. The Court can discern no prejudice to defendants from the filing of this rebuttal report.

According to the defendants, the second report is also unreliable in that it contains most of the same flaws as the original.[5] Chief among them is the failure, again, to analyze the data in terms of the actual facts relating to the process used to select employees for termination. Secondarily, Wertheimer formed sub-groups for this report that bear no relationship to the CRESP process. A hint of this fact is revealed in a footnote in the rebuttal report relating to the slot machine hypothetical, in which Wertheimer admits that "the situation is more complex than

tral." *Id.* Assuming that, absent age discrimination, a higher selection rate of older workers would occur equally as often as a higher rate for younger workers, Wertheimer expected that only 44.5 of the CRESP groups would have had higher rates for older workers. *Id.* Because sixty-nine groups had higher rates for older workers, the difference represents a disparity that is equivalent to 4.72 standard deviations, which would be statistically significant. *Id.* Yet, this analysis seems very similar to the "slot machine" hypothetical used by Wertheimer to discredit McCabe's sub-dividing the total population of managers into CRESP groups before analyzing selection rates. *See id.* at 2, ¶ 5. The point of the hypothetical was to demonstrate that the smaller the sample size, the less one can accurately detect trends in the results.

4. On March 4, 1996, this Court entered an order setting forth a schedule for expert witness depositions, and for summary judgment motions and other dispositive motions on liability issues. The last expert witness was to be deposed by April 29, 1996.

5. Defendants have also challenged Wertheimer's opinions about pension gains as unreliable and inadmissible under *Daubert.* In their response, plaintiffs stated they have determined that evidence from defendants, received after their expert's report, will provide a more accurate basis for Wertheimer's opinions at trial. However,

what has been presented because the ASI managerial workforce is not evenly split between younger and older employees." Pls.' Ex. 57, Wertheimer Rebuttal at 2, n.4. In fact, prior to the resizing, workers at least age forty or more comprised 58.1% of ASI's workforce, while those under age forty constituted 41.9%. Defs.' App. 104, McCabe Report. The difference in age composition of the workforce and among the various CRESP groups was not accounted for in Wertheimer's analyses of the effects of the resizing. In addition, Wertheimer included all of the employees who had volunteered to take early retirement among those described as "selected." As noted below, the Court finds this departure from the facts to be unsupported by sound scientific principles.

Plaintiffs have conceded the "limited value" of the profile of the U.S. managerial workforce. Pls.' Mem. In Oppos. To Defs.' Mot. To Strike Testimony of Expert Witness at 21. As defendants had noted, that comparison group was not sufficiently controlled for factors that would make it actually comparable to the management workforce at ASI.[6] In addition, the plaintiffs admit that

whether it is a violation of the ADEA to terminate workers to save in pension benefit costs has been resolved by the Supreme Court, and therefore is not relevant to the ADEA claims being considered in these motions. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that a decision to fire an employee in order to prevent his pension from vesting "would not constitute discriminatory treatment on the basis of age.").

6. Wertheimer apparently made the same mistake in another age discrimination case that was recently affirmed by the Second Circuit. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2nd Cir.1997). In that case, the district court had excluded Wertheimer's statistical analysis of promotion and termination rates of employees fifty years of age or older at Wyatt. Wertheimer concluded that employees aged fifty or more were treated differently than those under age fifty. *Id.* He reached this conclusion in part because he compared the promotion and termination rates of Wyatt employees aged fifty or more with their "counterparts" in the general population. *Id.* at 67. But his analysis "did not account for the presence in the comparison group of" people who were not similarly situated to the employees at Wyatt, which "rendered that group an unrepresentative sample for his comparison with Wyatt employees." *Id.* The court also found that Wertheimer failed to include promotions of employees who

their expert did not consider all of the possible variables affecting who was selected for termination. *Id.* However, they argue that they need only show a pattern of discrimination, and the burden shifts to the defendants to show that the "statistical disparity is due to a non-discriminatory variable or variables that plaintiffs failed to consider." Pls.' Mem. in Oppos. to Mot. to Strike at 22. In response, defendants argue that plaintiffs are attempting to shift their burden at the admissibility stage to them. This Court agrees.

■■■ In essence, plaintiffs are describing use of the *McDonnell Douglas* burden-shifting method of proof, which is not employed when determining the reliability of an expert's report.[7] Instead, reliability is founded on whether the expert is qualified and will testify to reliable scientific knowledge that is helpful to the trier of fact. Moreover, by framing the issue in terms of whether their expert must consider "all of the possible variables," the plaintiffs overlook the possibility that their expert may have failed to consider one of the major factors causing the disparity. *See Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (*per curiam*) (reversing lower court finding that plaintiff's statistical analyses were erroneous because they omitted information about differences caused by geographic location). In *Bazemore,* the Court said that an analysis that included less than "all measurable variables" may still prove a plaintiff's case. *Id.* at 400, 106 S.Ct. 3000. However, to be considered acceptable as evidence of discrimination the analysis must account "for the major factors" affecting the results. *Id.*

Citing *Bazemore,* the plaintiffs argue that any·failure to include variables in a statistical

analysis goes to its weight, not its admissibility. *Id.* Nevertheless, the Supreme Court noted that an analysis can be so incomplete that it is inadmissible as irrelevant. *Id.* n. 10. To determine if the analysis can carry the plaintiff's ultimate burden of proof a court must consider the factual context of the case, in light of all the evidence presented. *Id.* Despite the plaintiffs' contention, the defendants did not argue that plaintiffs' expert must account for all of the possible variables before his statistics would be meaningful. Instead, defendants asserted that major factors had been overlooked, such as, the non-fungibility of the managers, or the unique characteristics of the CRESP process that affected selection. If such omissions render the analysis incomplete, then Wertheimer's testimony would be inadmissible. With that understanding, the Court now turns to an evaluation of the proffered statistics in the context of the facts of this case.

■■■ Statistical evidence may prove discrimination when it shows a pattern of conduct against a protected group that, if unrebutted, would allow the inference of intentional discrimination against individual members. *Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1466 (6th Cir.), *cert. den.,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). The statistics, however, must show a "significant disparity" and must eliminate the "most common nondiscriminatory explanations for the disparity." *Id.* They must also bear a logical connection to the facts and circumstances being analyzed. *See O'Connor,* 116 S.Ct. at 1310; *Coser v. Moore,* 739 F.2d 746, 751 (2nd Cir.1984). The *Barnes* court indicated that the most

turned fifty during the twenty-six month period in which he tracked such decisions. *Id.* For both of these reasons, the Second Circuit found that Wertheimer's report would not have been helpful to the jury and was properly excluded. *Id.* Specifically, the court stated that Wertheimer's report "assume[d] that any anomalies in the Wyatt data must be caused by age discrimination, and ma[de] no attempt to account for other possible causes." *Id.* at 67–68.

7. In fact, the Supreme Court noted recently that it has not had occasion to decide whether the *McDonnell–Douglas* framework applies in the ADEA context. *See O'Connor v. Consolidated Coin Caters. Corp.,* 517 U.S. 308, 116 S.Ct. 1307,

1310, 134 L.Ed.2d 433 (1996). Nevertheless, because the parties did not contest its applicability, the Court proceeded to analyze the case under that framework. *Id.* Likewise, the Seventh Circuit has stated that the *McDonnell–Douglas* approach is "not an efficient formula for such a large-scale workplace restructuring" as occurred in the Bell companies. *See Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 889 (7th Cir.1997). Applying the approach in this context, it wrote, is "somewhat problematic" because it ignores the circumstances surrounding the terminations. However, because parties and district courts are comfortable using this method, the Seventh Circuit employed it as well. This Court will do the same.

obvious explanations for a statistical disparity in termination decisions are random chance or lower proficiency. *Barnes,* 896 F.2d at 1466. However, the facts and circumstances of any given case will influence what constitutes an obvious explanation, or the major factors.

The statistics offered by the plaintiffs have only eliminated random chance as a possible explanation for the disparities. *See* Pls.' Ex. 56, Wertheimer Report at 8, ¶¶ 14, 16, 20–22, 28; Defs.' App. 108, Rothman Report at 4; *see also EEOC v. Sears Roebuck & Co.* 839 F.2d 302, 323 n. 20 (7th Cir.1988) (standard deviation and other measures of statistical significance merely attempt to eliminate chance as reason for results, do not prove causation). That method would be valid if it is reasonable to assume that the job skills the defendants needed to retain were equally distributed across age groups. *See Barnes,* 896 F.2d at 1466. If it is not reasonable so to assume, a defendant can show that the statistical method is faulty, or that chance does explain the discrepancy, and the statistical evidence may lose its effectiveness altogether. *Id.* at 1469. If it is reasonable, the statistical evidence that shows a greater number of terminations among certain age groups than would be expected due to chance, may state a prima facie case for age discrimination. *Id.*

In *Barnes,* the court allowed the plaintiffs to use such statistical evidence to satisfy their prima facie case of age discrimination, but found those same statistics insufficient to prove that the defendants' proffered legitimate explanation was a pretext. *Id.* at 1468–69 (statistics cannot determine whether the more likely cause of the disparity was defendants' bias or a legitimate selection criterion). The court noted that when it appears that job skills are not evenly distributed across age groups, such statistics become much less probative. *Id.* at 1468. In the context of determining the reliability of proffered statistical evidence, the proponent has the burden of showing the reasonableness and validity of the expert's assumptions. *See Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1316 (9th Cir.), *cert. den.,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (party presenting expert must show that expert's findings are based on sound scientific method). Wertheimer's analyses assumed that the job skills to be retained were equally distributed across age groups. Plaintiffs argue that ASI treated its management workforce as fungible, so it was proper for their expert to do so as well.

 In a class action pattern or practice claim of age discrimination, a plaintiff must show that the "regular policy of the employer" was to discriminate on the basis of the protected trait. *Coates,* 756 F.2d at 532. The plaintiff's prima facie case often consists of statistical evidence showing a significant disparity between the employment decisions made regarding members of the protected group, and those made as to younger workers. *Id.* The statistics, however, will usually be "buttressed by evidence of general policies or specific instances of discrimination." *Id.* The focus is on whether there has been an overall pattern of discriminatory decision-making. *Id.*

 That pattern may be defeated, despite any amount of statistical evidence, if the defendant articulates sufficient nondiscriminatory reasons for each separate discharge. *Id.* If, however, the defendant only explains the discharges of the named plaintiffs or class representatives, the pattern or practice claim does not necessarily fail. *Id.* at 533. When strong statistical evidence establishes the prima facie case, a defendant's successful rebuttal of each particular decision to discharge weakens, but does not defeat, the class claim. *Id.* On the other hand, with respect to individual claims only, a defendant's showing that a discharge was based on a neutral assessment of the particular plaintiff's skills in relation to those of other employees, will defeat the claim. *Id.* The statistics proffered by the plaintiffs here are offered in support of both the pattern or practice claim and each individual plaintiff's claims.

 Turning to the report in controversy, the Court notes that in the conclusion of his report, Wertheimer states that in his professional opinion all of the evidence is consistent with the "1992–1993 Workforce Resizing Program treating employees at least age 40 differently from employees under age 40." Pls.' Ex. 56, Wertheimer Report at 25. He supports this conclusion with

his finding that ASI management employees at least fifty or more years of age are "significantly underrepresented" in relation to a "comparison group" of United States workers. The plaintiffs have already conceded the "limited value" of this comparison, and the Court sees no reason to further examine it. *See Hazelwood,* 433 U.S. at 308, 97 S.Ct. 2736 (dealing with issue of proper comparative groupings for purposes of determining from overall statistics whether an employer is discriminating). That is because, even if it were supported, Wertheimer's conclusion does not allow a finding of intentional discrimination by the defendants. Instead, it could only support a finding that the resizing program may have had a disparate impact on older workers. Such a finding says little about the defendants' intent.

■■ Even in a pattern or practice discrimination case, a plaintiff must still prove discriminatory intent. *Chicago Miniature,* 947 F.2d at 298. Intent means more than knowledge that a certain action will cause discriminatory results. *Id.* at 297. It means a subjective desire or wish for that result. *Id.* Here, the plaintiffs attempt to prove the defendants' wrongful intent with statistical evidence of a disparate impact from which they want the factfinder to infer an intent to discriminate. *Cf. Id.* (prima facie case can be established by statistical evidence ... buttressed by general policies or specific instances).

For this to occur, several inferential steps must be taken, and each one of them must be reasonable in light of the evidence. *See Salus v. G.T.E. Direct. Serv. Corp.,* 104 F.3d 131, 137 (7th Cir.1997) (reasonableness of inference questioned, but not considered clear error). The first step would be a finding that the resizing program in fact had a disparate impact on older workers, which would require the finders of fact to choose which expert's testimony and reports to accept as true. The Court's task here is to determine whether it is proper to put them to that choice. Next, the factfinder would have to conclude that the impact occurred because the selection process was tainted, either by the actions of the individual decisionmakers, or by some systemic defect, such as a criterion designed to target the older workers. Yet, the factfinder would also have to attribute the taint in the selection process to a conscious and deliberate choice by the defendants. *See Chicago Miniature,* 947 F.2d at 297 (intent means a subjective desire or wish). If the statistical evidence does not relate in some meaningful way to these steps, it will not be useful to the jury.

■■ Wertheimer found that the "termination process selected a significantly higher fraction of employees at least age 40 than of employees under age 40 at each stage of the process." Pls.' Ex. 56, Wertheimer Report at 25. Specifically, he noted that the termination rates "generally rose with age," which means his study found an association between the dependent variable of termination rates, and the independent variable of age. Again, for this association to support a finding of discriminatory intent, a factfinder would have to determine that the termination process was purposefully designed to achieve that result.

The termination rate is the number of terminated employees belonging to an age category divided by the number of workers in that age category before the terminations. *Id.* at 7, ¶¶ 11, 14. Essentially that figure represents the percentage of employees in a given age category that were terminated. Once Wertheimer calculated these percentages for all employees at least age 40 or more and for all employees less than age 40, he contrasted the percentages and found them "highly statistically significant," because the probability of these results occurring by chance was .009%, using a two-tailed test. *Id.* That equates with a 2.61 standard deviation,[8] or less than a one in a million

8. A standard deviation of greater than two is considered statistically significant. *See EEOC v. O & G Spring and Wire Forms Specialty,* 38 F.3d 872, 877 n. 6 (7th Cir.1994) (citing *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 309 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). As the Seventh Circuit noted in *Coates,* 756 F.2d at 537 n. 11, "[t]he 'standard deviation' is a number that quantifies the degree to which disparities spread out above and below the mean of distribution, thus describing the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample consisting of two groups (a binomial distribution). The greater the number of standard deviations, the less likely it is that chance is the

chance of it occurring by random chance. *Id.* According to Wertheimer, this difference is highly statistically significant.

However, Wertheimer's analysis fails to account for any other independent variable that might explain the association between age and termination rates, including job skills, education, experience, or self-selection. For an ADEA claim, in a work force resizing or restructuring context that includes an early retirement incentive, it is imperative that the analysis take these "unusual circumstances" into account. *See Hartley,* 124 F.3d at 889. Because Wertheimer's failure to do so is a departure from generally accepted methods in the field of statistical analysis, it must be shown to be grounded in "demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry." *Braun,* 84 F.3d at 235. In other words, he must have a scientifically-based reason for departing from the customary method of statistical analysis.

Instead, Wertheimer has explained his procedures by stating that he used information provided by the plaintiffs' counsel about the characteristics of the workforce he studied. He admitted to a lack of familiarity with the actual process used for the involuntary terminations. *See* Def.App. 118, Wertheimer Dep. at 160–62, 218, 238. In fact, when questioned about the source of information on which he based his judgment, Wertheimer stated that he relied on "information that was conveyed to [him] by [plaintiffs' counsel] ... [who] gave [Wertheimer] ... an impressionistic view of [the process]. But it certainly wasn't a detailed or specific

view of this process." *Id.* at 161–62. He also admitted that he did not know what criteria were used in Stage I of the process. *Id.* at 165. Moreover, Wertheimer disregarded the defendants' classification of certain employees as voluntary terminees, without an explanation for having done so.[9] Pls.' Ex. 56, Wertheimer's Report at 9, ¶ 19. The Court does not find this to be an adequate explanation for Wertheimer's departure from generally accepted statistical procedures. *See Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1163 (7th Cir.1994) ("Truly voluntary retirements do not give rise to an inference of age discrimination."). Thus, to the extent his testimony relates to a comparison of overall selection and termination rates for those employees aged forty and above, and those under forty, it should not be admitted.

The same problem weakens Wertheimer's analysis of *selection* rates. Wertheimer concluded that the rate at which employees were selected for possible termination (selection rate) was higher for employees at least age forty than the rate for employees less than forty. Pls.' Ex. 56, Wertheimer's Report at 25, ¶ 28(d). As noted, this analysis included those employees who may have been selected, but who took a voluntary early retirement package. *Id.* at 9, ¶ 19. He found the selection rates to be as follows: aged forty or more, 16.5%, under age forty, 10.9%. The disparity between the two rates was equivalent to 6.68 standard deviations, which Wertheimer found to be "highly statistically significant." Although he has not adequately explained his reason for doing so, Wertheimer considered the em-

cause of any difference between the expected and observed results." *Sears Roebuck & Co.,* 839 F.2d at 323 n. 20. In addition, the Supreme Court has noted that under a "two-tail" test of statistical significance, "[a]s a general rule for ... large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that a [disparity] was random would be suspect to a social scientist." *Castaneda v. Partida,* 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). As the district court in *Sears Roebuck* noted, "standard deviation and other measures of statistical significance merely attempt to eliminate chance as the reason for the results. They do not prove what in fact caused the results." 839 F.2d at 323 n. 20.

9. Wertheimer's "explanation" in his report implies that these employees were given a "chance to 'volunteer' to leave instead of being terminated involuntarily." Wertheimer Report at 9, ¶ 19. Yet, in the report he indicates that this choice was given them "either before or after learning they had been selected." *Id.* Even more telling, in his deposition Wertheimer agreed that he went "a little bit too far" when he said the volunteers were given a choice of volunteering or being terminated involuntarily. Defs.' Ex. 118, Wertheimer Dep. at 171–72. He stated that it "would have been better if I said many of these selected employees may have been given a chance to volunteer." *Id.*

ployees who took early retirement to be "involuntarily terminated," rather than self-selectors. Pls.' Ex. 56, Wertheimer Report, at 9, ¶ 19. The Court has found this to be a departure from generally accepted methods of scientific inquiry, and will not admit evidence about selection rates that ignores the factor of self-selection.

Wertheimer's report provides an indication of this factor's effect on the results. When the termination rates (instead of selection rates) of employees aged forty or more are compared with those for under age forty, the disparity diminishes significantly. The termination rate for employees who were at least forty was 11.7%, while the rate for those less than forty was 9.7%. Pls.' Ex. 56, Report at 25, ¶ 28(b). That reflects a difference of 2%, or 2.61 standard deviations, which Wertheimer also found to be "highly statistically significant." *Id.*; Report, Table D–5. According to defendants' expert, because the workforce resizing program used two simultaneous methods to reduce the number of managers, a voluntary and an involuntary one, the statistical analysis should present the results of each method separately. Defs.' App. 104, "Analysis of Employment Data for Ameritech Services, Inc." by George P. McCabe, Ph.D. ("McCabe Report") at 12. The voluntary method included an early retirement package with incentives, and the involuntary method used the CRESP termination process. *Id.*

The percent of total terminated employees who were aged forty or more was 62.6%, while the percent of terminees under age forty was 37.4%. *Id.* at 8, ¶ 15. When compared to the proportion of employees prior to the resizing program that were aged forty or more, 58.9%, and those under forty, 41.9%, the two sets of numbers do not appear very different to the untrained eye. Nevertheless, they are different, and the plaintiffs say they demonstrate that a higher number of employees under age forty were left in the workforce after the resizing than were there before the resizing. Conversely, a lower number of employees aged forty or more were left in the workforce after the resizing.

The plaintiffs basically offer those statistics, and various permutations and computations related to those figures, as support for a finding that the defendants had a regular and ongoing policy of treating employees aged forty or more less favorably than it treated those under age forty. In essence, by showing a disparate impact the plaintiffs seek to elicit a finding of deliberate and intentional discrimination because of age. The problem with this strategy is that the statistics do not reveal the cause of the disparity, and when only disparate treatment is available to prove discrimination, the analysis of causation is crucial.

■■■ Given Wertheimer's admission that he did not know much about the process used by ASI to resize its workforce, or about the criteria used for selecting terminees, and that he assumed that all of the 6,695 managers involved in the CRESP process were interchangeable, the Court is not comfortable relying on the results of his statistical analyses. His departures from generally accepted scientific methodology, coupled with the absence of a scientifically-based reason for such departures, do not provide satisfactory indices of reliability for Wertheimer's statistical analyses. In addition, his proposed testimony in this case does not appear to be about "matters growing naturally and directly out of research [he] has conducted independent of the litigation." *See Daubert,* 43 F.3d at 1317 (on remand from the Supreme Court). That means that plaintiffs must come up with other "objective, verifiable evidence" that his proposed testimony is based on "scientifically valid principles." *Id.* at 1318.

To accomplish this, a plaintiff could show that the methods and conclusions reached have been subjected to peer review, or published in a "generally-recognized scientific journal that conditions publication on a bona fide process of peer review." *Id.* If these methods are unavailable, the plaintiff may try to satisfy the inquiry with testimony from the proposed expert, explaining precisely how he reached his conclusions and pointing to some objective source to show that he followed the scientific method as it is practiced in his field. *Id.* at 1319. Other methods of demonstrating the reliability of the scientific evidence include providing evidence of the known and potential rate of error, or about the "general acceptance" of the theory or technique. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786.

Rather than provide the Court with any of these indices of reliability of their expert's testimony, the plaintiffs have argued that the motions to strike their experts' testimony should not have the effect of excluding the evidence as long as it raises a triable issue. In essence, plaintiffs ask the Court to assume the admissibility of the experts' testimony and proceed to determine whether it is sufficient to create a genuine issue of material fact. The Court will not assume admissibility of any piece of evidence offered by a party in support of or opposition to a motion for summary judgment. To do so would violate the court's clear duty under Rule 56.[10]

Next, the plaintiffs offer the general proposition that the federal rules of evidence favor admissibility, and that Rule 702 was designed to remove the common law barriers to opinion testimony. They also contend that *Daubert* expanded the scope of admissible opinions. After citing Rules 401, 402 and 403, and their limitations on admissibility, the plaintiffs note that expert witnesses are allowed to offer opinions that are not based on "first-hand knowledge or observation." While not specifically stating so, the plaintiffs appear to be suggesting that their witness meets all of these criteria for admissibility, and that it is permissible for him to testify based on information provided to him by plaintiffs' counsel. That may be true, but for the expert's testimony to be reliable and useful, the information provided must be an accurate reflection of the real world events the expert is helping to interpret. If not, the court may "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, — U.S. —, —, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). Nothing in plaintiffs' argument persuades the Court to abandon admissibility analysis, which is focused in part on the gap between the data and Wertheimer's opinion.

Trying another tactic, the plaintiffs argue that the defendants are confusing admissibility with probative value, and as long as their expert's evidence meets "minimal standards of reliability" it would be error for the court to exclude it. In doing so, the Court would be substituting its judgment for that of the jury. This Court cannot agree. The standards of reliability have been thoroughly set forth and applied in this order, and the Court is satisfied that its decision to exclude Wertheimer's proffered evidence as unreliable and not helpful is amply supported. However, even if the proposed testimony were sufficiently reliable to be admissible, it would be unlikely to survive a Rule 403 balancing test. The Court has found deficiencies that not only weaken the proposed evidence to the point of being unreliable and inadmissible under *Daubert*, but that would also render it so lacking in probative weight that it would fail to offset the substantial risk of prejudice, or of misleading or confusing the jury, that accompanies such evidence. Because expert testimony "can be both powerful and quite misleading," judges considering the limitations in Rule 403 "exercise more control over experts than over lay witnesses." *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

Finally, the plaintiffs argue that pattern or practice cases require proof that a large number of events are linked by a clear pattern of favoring one group over another, in a large number of decisions. With large groups, it is unlikely that a discernable pattern can be attributed to mere chance, so statistics such as the plaintiffs offer, that measure the probability that an observed pattern could be attributed to chance, would provide relevant evidence. Again, the plaintiffs have used a generalization to attempt to prove a specific case.[11] It will not work. If

10. Fed.R.Civ.P. 56(e) provides that evidence in the form of affidavits "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." When the evidence comes from an expert witness, the affidavits or reports should set forth "a process of reasoning beginning from a firm foundation." *Mid–State*, 877 F.2d at 1339. Expertise is a rational pro-

cess, and a "rational process implies expressed reasons for a judgment." *Id.*

11. Plaintiffs have also noted that it is "clear error" to reject a statistical analysis for failure to consider all variables so long as the major relevant factors are accounted for. While this is true in the abstract, it does not relate to the expert testimony at issue. The Court has found that the major relevant factors of self-selection, job skills and functions, and the value the employer placed

the statistics have failed to account for major factors that may explain any possible pattern of disparate impact, they will not provide a valid, reliable, or useful measure of what actually happened. That is what the Court has found to be the case here. Defendants' expert has provided the court with an analysis that accounts for the missing factors from Wertheimer's study because it has analyzed the actual CRESP groups, in terms of the ages of those who were terminated, and found that out of 122 CRESP ranking groups, only five have statistically significant differences in selection rates, with the rate for those under the age of forty found to be less than the rate for those age forty and over. Defs.' App. 104, McCabe Report at 15, C2–21 to C2–26, C3–4.

Nor can plaintiffs show the reliability of Wertheimer's methods by pointing to some independent research out of which those methods emerged. According to his curriculum vitae, Wertheimer has a Ph.D. in economics, and has worked as a researcher for The Urban Institute, where he spent fourteen years directing complex research projects that involved testing, validating, and applying state-of-the-art econometrics and demographic forecasting models. Pls.' Ex. 60. He has also performed research for DRI/McGraw–Hill, which included projects such as analyzing wages in the health sector in comparison to those of other comparable workers, forecasting mail volume for the United States Postal Service, some unspecified work that focused on "market size, growth, and share issues," and labor "arbitration and demographic analysis and forecasting." *Id.* His recent publications range from a report on the cost-benefit analysis of the Javits–Wagner–O'Day Program, submitted to the National Industries for the Blind in August, 1995, to a report on the "Distributional Impacts of Raising Federal Excise Taxes," submitted to the National Chamber Foundation in November 1990. Primarily, his publications have been reports or presentations on subjects related to policy issues as requested by the clients for whom he has worked. *Id.* There is no evidence of independent research out of which the current

statistical analysis has grown, and there have been few, if any, articles that were submitted to peer review journals.

By comparison, defendants' expert has a Ph.D. in mathematical statistics from Columbia University, and is currently a professor of statistics and head of statistical consulting at Purdue University. Defs.' App. 104, app. D, McCabe Curriculum Vitae. He has taught at Purdue since 1970, and during that time he has served as a visiting professor of statistics at the University of Berne, in Switzerland, and at Princeton University. *Id.* In 1995, he served as a guest researcher at the National Institute of Standards and Technology. *Id.* McCabe has served as an Associate Editor for *Computational Statistics and Data Analysis* since 1982, and he is a member of the Management Committee for the *Journal of Educational and Behavioral Statistics. Id.* From 1978 to 1986 he was an Associate Editor for *Technometrics. Id.* His research interests include applied statistics, mathematical statistics, statistical computing and statistics and the law.

McCabe is the author, with David Moore, of the textbook, **Introduction to the Practice of Statistics**, currently in its second edition. *Id.* He is also the author, or co-author, of more than 100 publications, with recent ones ranging from a 1991 article, "Optimal Sample Allocation for Normal Discrimination and Logistic Regression under Stratified Sampling," published in the *Journal of the American Statistical Association,* to "Vitamin B6 Status of Egyptian Mothers: Relation to Infant Behavior and Maternal Infant Interaction," published in the *American Journal of Clinical Nutrition* in 1990. As of March 1996, he had nineteen articles submitted for publication, three of which had been accepted. *Id.* Of his most recent research, the Court notes that he has written about proper sample sizes, instrument reliability, power as a function of reliability, probabilistic fatigue analysis of multiple site damage, evaluating the efficiency of blocking without assuming compound symmetry, and interpreting blocks and random factors. *Id.* The

on various attributes as reflected in the criteria used were not accounted for in Wertheimer's

statistical model.

latter two projects were published in the *Journal of the American Statistical Association. Id.* Of further interest is the fact that he has written an article on "Regression Analysis as Statistical Evidence," which appeared in a 1986 issue of *Statistical Evidence of Discrimination.*

In terms of whether the experts' proffered statistical analyses were a natural outgrowth of their independent research, Wertheimer and McCabe are not comparable. Wertheimer does not appear to meet that criterion, for none of his recent work appears to have required him to construct a statistical model based on data he had to understand and interpret in context, and then analyze that data in a meaningful way to accurately determine the cause and effect relationships among various factors. Instead, his work appears to have involved describing a current or proposed situation and, using economics methods, forecasting what that means for the future of some industry, policy, or agency.

Neither are Wertheimer's methods and principles reliable for having been published in peer reviewed journals. Almost without exception, his publications have been directed at social, financial, political and business publications, agencies or organizations.[12] Without these two objective indices of reliability to support the scientific validity of Wertheimer's work and methods, the plaintiffs must resort to other means, such as testimony from Wertheimer explaining how he reached his conclusions and pointing to some objective source to show that he followed valid scientific methods. Unfortunately, Wertheimer's explanations are deficient, and the sources of his information are not objective. For example, in the section analyzing the termination process at ASI, Wertheimer did not describe the process at all, instead indicating in a footnote that he was "asked to assume by plaintiff's attorney that [a given report] was the most authoritative report available on the 1992 termination rates." Pls.' Ex. 56, Report at 7, n.7.

Plaintiffs maintain that Wertheimer's method of aggregating a large number of decisions, that were made during a resizing program with which he was unfamiliar, is valid because those decisions are linked by a "clear pattern of favoring one group over another." In a way, that is like saying the results of the study validate the method used. However, simply asserting the validity of the methods used does not make them so. *See Mid-State*, 877 F.2d at 1340. The fact that Wertheimer declares his methods proper, without providing the Court with a satisfactory explanation for his failure to test the validity of his hypothesis against the actual characteristics and process of the resizing program, is akin to an extrapolation from existing data that is connected only by the expert's bare assertion. *See Joiner*, 118 S.Ct. at 517. At best, Wertheimer's statistics may suggest a somewhat disparate impact on older workers, but not a clear pattern of favoring one group over another, which is a value-laden and subjective assertion. As the Court has already found, the statistical analyses performed by Wertheimer are deficient in that they do not accurately reflect what actually occurred. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (fit is not always obvious, and scientific validity for one purpose is not necessarily true for another).

■ Another problem with these statistics is, even if they could be found to show that older workers were more likely to be selected than younger workers, they do not demonstrate that the difference was "because of" their age. The ADEA does not prohibit an employer from taking actions that have a disparate impact on older workers. *See* 29 U.S.C. § 623(f)(1). Consequently, the plaintiffs' proof must show the existence of the prohibited intent to discriminate on the basis of age, that is, causation. For statistics to accomplish this they must show a significant disparity and eliminate the most common non-discriminatory reasons for the disparity. *See Barnes*, 896 F.2d at 1466. In a class pattern or practice case, a plaintiff usually must supplement statistics with evidence of general policies or specific instances of discrimination. *Coates*, 756 F.2d at 532. However, the plaintiffs' statistics do not address

---

12. The Court notes that in 1972, it appears that Wertheimer prepared a report on "Labor Market Activity in a Microsimulation Model" for *Proceedings for the Meetings of the American Statistical Association.* Wertheimer is a member of the American Econometrics Association and the National Association of Forensic Economics, but not the American Statistical Association.

other possible causes of the termination disparities, nor is there any evidence that older workers were subjected to greater or more intense scrutiny than younger workers, or had less of an opportunity to be retained. The standards and criteria that were applied to both older and younger workers were facially neutral, and no evidence exists that their application was inconsistent.

Although Wertheimer's analyses show that older workers tended to be terminated at higher rates than younger workers, that "fact" is only probative if the issue is disparate impact. *See Noreuil v. Peabody Coal Co.,* 96 F.3d 254, 259 (7th Cir.1996) (disparate impact theory requires statistical correlation evidence showing that specific employment practice has disproportionately negative effect on members of protected group). The crucial issue under the ADEA is what caused the difference. Wertheimer admits that it can be perilous to draw conclusions from average percentages or rates based on aggregate categorical data, without knowing more about the specific situation. Defs.' App. 118, Wertheimer Dep. at 28. In response to a hypothetical describing a company downsizing with characteristics very similar to those defendants maintain existed in their resizing, Wertheimer agrees that it could be misleading to simply compare overall termination rates by age, without considering the separate job categories, and the number of people and age mixtures in each category. *Id.* at 29.

 Interestingly, he indicates that he would "need to know more about the circumstances in order to ... be able to decide what degree of breakdown was appropriate." *Id.* If the individuals being studied are fungible, or interchangeable, then it is not necessary to divide the population into groups. *Id.* at 32. He also admits that unless a person knows that the population is basically fungible, he or she would not know what an overall average selection rate really means. *Id.* He quickly follows that admission with,

"but it was my understanding from plaintiffs' attorney that the overwhelming majority of the employees, these management employees, they were concentrated in relatively low-level management ... that their skills were general business skills, and that there was not a large difference in the skill sets of these people." *Id.* at 32–33. Thus, he thought it appropriate to treat the managers at ASI [13] as fungible or readily interchangeable, "so they constituted homogeneous units for [him] to work with." *Id.* at 33–34. Wertheimer had received no study or written report confirming this status of the entire group of managers, and he knew that the group consisted of approximately 6,600 people. *Id.* at 34.

Wertheimer also admits that he knew about the sorting of managers into CRESP groups, which he understood to be groups of managers with a set of similar skills, but he did not think these sub-groups needed separate analysis. *Id.* at 35. This conclusion was also based on what plaintiffs' counsel had told him. *Id.* He was told that the CRESP groups were formed based on comparable skills, but not based on different job functions. *Id.* at 37. Consequently, he combined all of the managers as a "single universe of fungible units" when conducting his analysis. *Id.*

By implication from his testimony, Wertheimer's statistical method would produce misleading results if the employees in the various CRESP groups that he aggregated were in fact dissimilar in terms of job functions, experience, performance and education. *See id.* at 38–41. With reference to a "company downsizing hypothetical" given to him during his deposition, in which the overall selection rate for those forty and over was 29%, and the overall rate for those under forty was 22%, Wertheimer said the overall or general average selection rate did not accurately reflect what was happening in the different categories. *Id.* That is because

---

**13.** In their complaint, the plaintiffs allege that a number of them who were recent transfers from Indiana Bell to ASI at the time of the resizing, were "terminated jointly" by the two companies. Amd. Compt. ¶ 6. The evidence provided does not support that allegation, but because the plaintiffs attempt to prove discrimination that affected a class of employees in both companies, Amd. Compt. ¶ 9, the Court has continued to refer to Indiana Bell in this order. It is assumed that the resolution of the pending motions will affect all potential class members, regardless of whom employed them.

the number of selected workers who were forty or more exceeded the number who were less than forty in seven of the eight different functional categories in the hypothetical. In fact, Wertheimer specifically stated that in a situation such as this hypothetical, the first question to ask is whether it is appropriate to make a comparison between the two age groups in the aggregate. *Id.* at 40. If the job functions are distinctly different, for example, clerical workers, engineers, truck drivers and lawyers, then it would not be appropriate to combine them for purposes of comparing selection rates based on age. *Id.* Thus, if defendants can show that the ASI managers were not interchangeable, then plaintiffs' expert witness has invalidated his own statistical studies.

Defendants have made such a showing. Their proof, especially the CRESP Training Manual, shows that every effort was made to create homogeneous groups of employees who would be ranked in relation to each other. Further, that document is supported by Morris' testimony about the goals for the CRESP groupings, and that of many other managers and department heads. *See* Defs.' App. 75, Catlow Aff. (age 45);[14] App. 76, Fulmer Aff. (age 55); App. 77, Hauf Aff. (age 44); App. 78, Kledzik Aff. (age 44); App. 79, Kreucher Aff. (age 46); App. 80, Kuczmanski Aff. (age 50); App. 81, LaCrosse Aff. (age 47); App. 82, Little Aff. (age 46); App. 83, Lockwood Aff. (age 48); App. 85, Luby Aff. (age 56); App. 87, Peters Aff. (age 57); 88, Porento Aff. (age 44); App. 89, Resler Aff. (age 47); App. 90, Sappenfield Aff. (age 42); App. 91, Smith Aff. (1st female, age 38); App. 92, Vaughn Aff. (age 45); App. 93, Goetz Dep. at 71; App. 98, Morris Dep. at 99–105. The only thing the plaintiffs have offered to rebut this proof is their statistical evidence, along with evidence that certain CRESP groups contained managers with different salary grades or job functions, and that, at some earlier time, managers had been transferred from one department to another. *See* Pls.' Mem. In Opp'n To Defs.' Mot. To Strike at 7–8, citing: Defs.' App. 104, McCabe Report at 1–12; Pls.' Ex. 134A; Pls.' Ex. 8; Pls.' Ex. 130, Langford Dep. at 147–48.

Plaintiffs' evidence suffers from several deficiencies. First, the statistical evidence is not relevant to the issue of determining the significance of the composition of the CRESP groups, and cannot create a genuine issue of material fact on this issue. Because Wertheimer's statistical analysis was conducted without regard to the actual reasons for dividing employees into CRESP groups, and because of his relative unfamiliarity with the process used for selection, the statistical evidence does not enlighten the Court about whether it was appropriate to consider all managers interchangeable. Nor could evidence that one CRESP group included both a secretary and the director of usage pricing, Richard Langford ("Langford"), suffice to discredit defendants' evidence of attempted homogeneity. Neither does it show that the defendants did not genuinely believe, and act as if, the CRESP groups were homogeneous.

Some examples will further demonstrate the deficiencies of plaintiffs' evidence. Plaintiffs refer to the June 1992 Work Elimination Task Force ("Task Force" or "Ligett Task Force"), headed by Robert Ligett, as evidence that ASI initially planned to eliminate job functions, then changed course to eliminate people. According to plaintiffs, Ligett said that ASI eliminated people, but not necessarily the *work* the Task Force had identified. However, upon review of the designated pages of Ligett's deposition, the Court cannot discern any such statement. *See* Pls.' Ex. 53, Ligett Dep. at 165–66. Rather, the testimony on those pages relates to a question from the previous page, which was not supplied, and the following response from Ligett:

> Well, I mean, Lee's comments about trends, in these kind of categories. I mean, we were looking at work, this relates to categories. I mean, this wouldn't have been helpful to us in doing our task.

Pls.' Ex. 53, Ligett Dep. at 165. Earlier in the deposition, Ligett had recalled that he had served both as the head of the Task Force and as a ranker in the resizing program. *See* Pls.' Ex. 53, Ligett Dep. at 134–35. Consequently, it is not clear from the

---

14. Because this is an age discrimination, the Court thought it useful to note the ages of the managers who were involved in coordinating or participating in the CRESP ranking process.

**1108**

above-referenced statement in which capacity he was speaking. In fact, in his earlier testimony, Ligett specifically stated that the Workforce Resizing Program was a partial implementation of the recommendations of the Task Force. *Id.* at 136.

Another example of facts intended to support the notion that the resizing was not related to the workforce elimination task force is equally unavailing. Plaintiffs state that Langford was terminated even though he worked in a position that was "probably not" identified for reduction. Pls.'s Brf. In Oppos. To Mot. To Strike at 7. Their support for this statement is that, after briefly reviewing a list handed to him during his deposition, Ligett stated that it appeared the function performed by Langford was not on the list, meaning it was likely not among the recommendations for cutbacks. Pls.' Ex. 53, Ligett Dep. at 171–72. However, Ligett proceeded to recall that he had been one of the people who spoke about Langford's work during the ranking session, and he had told the group that he found Langford's work disappointing. *Id.* at 172. At no point have the defendants asserted that the resizing program would only affect people who performed work identified by the Task Force as unnecessary, or over staffed. This evidence demonstrates that weak managers were at risk as well, and it does not support an inference that ASI had planned to target only job functions, and then switched to targeting people. Moreover, it gives ample support for any decision relating to Langford.

Other evidence, offered by plaintiffs to support a finding that CRESP groups crossed salary grade and job function lines, consists of a general reference to twelve pages of a report by defendants' expert, McCabe. However, in none of those pages is found any support for that contention. In fact, McCabe specifically described CRESP groups as "groups of jobs requiring similar skills" within each vice-presidential division. Defs.' App. 104, McCabe's Report at 9. He also stated that "in most cases, each of these groups consisted of only one salary grade; but for some, more than one salary grade was grouped together .... " *Id.* Further, once the initial CRESP grouping was made in Stage I, based on vice presidential division, job function and job skills, the large

CRESP groups were sub-divided into smaller ranking groups of approximately thirty employees. *Id.* at 10. In some cases, geographical or other business considerations affected the sub-divisions. *Id.* McCabe's report simply does not support the contention that CRESP groups were constructed in a random fashion. Rather, it supports the opposite conclusion. There may have been exceptions in certain groups, but they do not disprove the rule.

To bolster the evidence from McCabe's report, Plaintiffs point to testimony from Langford's deposition that they claim supports a finding that the CRESP groups crossed functional and salary lines. Langford, who is one of the named plaintiffs, was deposed on April 9 and 10, 1995, and was shown a document (Deposition Ex. 143) during the deposition. Pls.' Ex. 130, Langford Dep. at 147–48. When asked if he had seen the document before, Langford indicated he had first seen it during the deposition the day before. *Id.* at 146. From the minimal context and foundation provided in the cited deposition pages, this document seems to have been some type of list, perhaps of people in the CRESP group to which Langford was assigned. Langford's name was on it, as well as names of some people with whom he had worked. Pls.' Ex. 130, Langford Dep. at 146–48. According to Langford, he was surprised to find the name of Ligett's secretary on it. *Id.* at 147. He had assumed the list was for people in his salary grade. *Id.* That was the extent of identification of, and discussion about, this document, which Langford admitted to have seen for the first time the day before. This testimony hardly qualifies as evidence based on personal knowledge, setting forth facts that would be admissible in evidence, and showing affirmatively that Langford is competent to testify to the matter. It is insufficient to support a finding that CRESP groups were formed randomly, without regard to job functions or salary grades.

Other evidence plaintiffs offer in support of their contention about the CRESP groups is equally unavailing. In a further attempt to demonstrate that defendants did not consider the value to the company of the work

being performed, and, presumably, that they were indifferent to job functions, the plaintiffs point to a newsletter, published by Ameritech Corp. *See* Pls.' Ex. 8. However, in the face of the voluminous testimony and evidence about the way CRESP groups were formed, and how the lines were drawn in each CRESP group in relation to the Task Force recommendations, the Court cannot attribute much weight to a corporate newsletter. During the relevant time period, Ameritech Corp. owned Indiana Bell, as well as the Bell operating companies in Illinois, Michigan, Ohio, and Wisconsin. In turn, these five Bell companies owned ASI. Notebaert Dep., p. 210; Reiman Dep., pp. 16–17. There is no evidence to show that the purpose of the newsletter was to explain in detail all of the factors that one of Ameritech Corp.'s many companies would use to make its force reductions. If Ameritech Corp.' purpose for the article was to generally describe the resizing process for employees throughout its many companies, then it would follow that the newsletter would have less detailed information that might be specific to a particular company.

Plaintiffs' citation to the alleged "Kulick Memo," and their arguments regarding same, are without merit and warrant no further discussion.[15] Finally, the reference to ASI's historical practice of allowing its managers to move from one department or locality to another, even if true, does not support a finding that the CRESP groups were not intended to be homogenous with respect to job functions and skills. While ASI may have allowed such transfers during the course of a given manager's career development, the purpose of the resizing was not to assist with career development. The circumstances of the former were not the same as those facing defendants in 1992, when they were reducing the overall size of their workforce to become more competitive. The goal was to operate more efficiently, in an economic sense of the word, with fewer levels of middle managers. It was also to monitor the force reductions so as to avoid endangering customer service, which would jeopardize their competitiveness. To that end, the defendants created their own definition of comparable managers and applied it during the resizing process.

■ Thus, the CRESP groups were homogeneous in that the managers placed in a given group were thought to share similar skills within job functions that would enable the employer to objectively and fairly evaluate them in relation to others who were similarly situated. The ADEA does not require a company to "establish an interdepartmental transfer program during the course of a RIF." *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir.1995). In other words, ASI was not required to consider all of a given employee's skills and rank him or her in relation to all positions within the company for which he or she might be qualified. Consequently, defendants' decision to group managers according to job functions and only rank them within those groupings does not violate the ADEA. Plaintiffs have provided no evidence sufficient to challenge defendants' description of the CRESP process or groupings.

■ Nor have they shown that ASI did not genuinely believe, and act as if, the CRESP groups were homogeneous. The process for deciding which employees should be terminated has been adequately explained by the defendants. It was an elaborate and decentralized process for ranking employees with similar job functions, deciding how many employees need to be cut from each functional division, and then determining which, if any, employees should be retained due to special factors, such as unique skills or experience. *See Coser*, 739 F.2d at 750 ("Where uncoordinated and independent employment decisions are made by different persons, statistics as to hiring by the overall

---

**15.** Except that plaintiffs' exhibits have a disturbing tendency to include copies of documents that are almost impossible to identify and which are not attested by any form of sworn testimony. Rule 56(e) provides that evidence in the form of affidavits "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The Court may allow a party to supplement those affidavits with depositions, answers to interrogatories and further affidavits. Nowhere does the rule permit the use of a copy of a document that provides no indication of its source, its validity, or reliability. The Kulick Memo is of that type.

entity may be less significant in demonstrating bias than where a single office makes all employment decisions."). Because the plaintiffs have not offered sufficient evidence to create a genuine issue of material fact on the interchangeability of managers, the defendants prevail on that issue. Wertheimer's testimony about how his statistical analyses depended on the interchangeability of all the managers being studied nullifies his report that assumes that characteristic.

This fact means that plaintiffs' own expert has discredited plaintiffs' proffered statistical evidence. The analyses conducted by Wertheimer may amount to nothing more than adverse impact studies of questionable validity. Further, they offer nothing to show why the resizing affected older workers differently than younger, if in fact it did. The ADEA allows for disparate impact as long as reasonable factors are used to differentiate among workers. For example, if older workers were less skilled in job functions that would be valued more highly in the new competitive environment, or were in fact more complacent and less willing to change, then defendants' act of weeding them out at a higher rate than younger workers is reasonable and does not violate the ADEA.

In light of these significant deficiencies, the plaintiffs' statistical evidence appears to be unreliable, in that the expert failed to explain how his methods comport with generally accepted scientific principles, and were the proper methods for conducting a statistical analysis for purposes of supporting a hypothesis about causation. He did not know what actually occurred in the group of individuals he studied, nor did he know that they were dissimilar in ways that mattered in terms of the reasons for the resizing. The statistical evidence is also irrelevant, because it has no tendency to prove a fact that is material to the plaintiffs' claim.[16]

For all of the reasons set forth above, the Court **GRANTS** defendants' motion to strike the evidence submitted in support of summary judgment by Wertheimer, and to the extent that their reports depend on Wertheimer's analyses, the reports by Marc

Bendick, Jr., and Lance Seberhagen. In addition, Seberhagen's testimony about the disparate impact on older workers of use of the criterion "growth potential" during the downsizing is not only irrelevant, in that it relates to a theory of recovery not available under the ADEA, but is also not helpful to the factfinder. The likelihood of confusing the jury with testimony of an "expert" on the meaning of a phrase, when jurors are capable of discerning that meaning themselves, would be great. It is also highly prejudicial to allow someone bearing the mantle of "expert" to testify about the meaning of a criterion that the defendants had already defined in their training materials. For these reasons also, Seberhagen's testimony is **STRICKEN** as irrelevant, unreliable, and not helpful to the factfinder.

## II. MOTIONS FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment on both the pattern or practice and the individual claims presented by the plaintiffs. The bulk of plaintiffs' evidence on the pattern or practice claim consisted of the statistical analyses of their expert, Wertheimer, and the corroborating and supplemental reports by Bendick and Seberhagen. Because the Court has found those experts' testimony to be unreliable, irrelevant or not sufficiently helpful to the factfinder to admit, plaintiffs are left with little evidence in support of that method of proving discrimination. What remains is to determine whether sufficient additional evidence has been presented to create an issue of material fact in a pattern or practice claim of age discrimination. Likewise, the Court must determine whether sufficient evidence was presented to create a genuine issue of material fact in connection with the individual claims of each named plaintiff. To accomplish these objectives requires a brief discussion of what constitutes sufficient evidence, followed by an evaluation of the plaintiffs' evidence.

---

**16.** In response to the challenge by defendants, the plaintiffs have also stated that they do not intend to call one of their experts, Michael Murphy, at trial and they have withdrawn his name from the witness list. Pls.' Mem. In Oppos. To Defs.' Mot. To Strike Testimony of Expert Witnesses at 1, n.1.

## A. SUFFICIENCY OF EVIDENCE

The Court has found that plaintiffs' experts could not provide the jury with any assistance by means of their testimony. As noted, the admissibility of any evidence depends on the purpose for which it is being offered. Some of the evidence offered was not relevant, in that it failed to address the actual facts of this case. Other evidence was relevant to an issue in dispute, but the issue was not material. For example, proof that the CRESP process had a disparate impact on older workers, without more, does not show a pattern or practice of intentional discrimination because of age. The rest of the evidence from plaintiffs' experts lost out in the Rule 403 balance, because its relatively slight probative value was substantially offset by its ability to mislead or confuse a jury.

 However, even if the experts' testimony were admissible, the Court finds that it would not be sufficient to overcome summary judgment on either the individual or the pattern or practice claims. Admissibility and sufficiency of scientific evidence require two different inquiries. *In re Joint Eastern & South. Dist. Asbestos Lit.*, 52 F.3d 1124 (2nd Cir.1995) (*"Eastern & Southern"*). At the threshold is admissibility, and *Daubert* applies. With sufficiency, the issue is whether the "collective weight of a litigant's evidence is adequate to present a jury question." *Id.* at 1132. In *Eastern & Southern,* both parties' experts possessed impressive credentials and their testimony was admissible. The issue was whether it was sufficient to justify a jury's verdict on causation. *Daubert* does not govern sufficiency determinations. *Id.*

In cases that hinge on competing interpretations of scientific or technical evidence, sufficiency poses unique difficulties. *See id.* at 1133. For example, "[b]y its nature, epidemiology is ill-suited to lead a factfinder toward definitive answers, dealing as it does in statistical probabilities and the continual possibility of confounding causal factors." *Id.* In cases such as this, the court's determination of sufficiency should be guided by the standard used for judgment as a matter of law. If, viewing the evidence in a light most favor-able to the nonmoving party, and without judging credibility of the witnesses or otherwise weighing the evidence, the evidence can lead to but one conclusion, then judgment should be entered accordingly. *Id.*

In other words, the focus is no longer on any dispute about the validity or force of the given evidence, but on whether it would be unreasonable for a rational jury to rely on that study or evidence to find causation by a preponderance of the evidence. *Id.* at 1133. Sufficiency assessments entail a review of the sum total of a plaintiff's evidence. In *Eastern & Southern* the district court had mistakenly assessed the weight of the evidence, the credibility of the witnesses, and had substituted its own judgment for the jury's, which resulted in a reversal by the appellate court. *Id.* at 1137 (stating that the district court had "impermissibly made a number of independent scientific conclusions").

As noted in *Barnes,* one way of showing disparate treatment, at least initially, is with statistical evidence of a disproportionate termination rate for older as opposed to younger workers. 896 F.2d at 1466. Such evidence, however, is relatively easy to rebut by a defendant who has carefully documented the procedures used to select employees for termination. That is the situation here. Moreover, the fact that the defendants built into their resizing system several checks to make sure that the termination decisions were not having a disproportionate effect on members of protected groups, such as minorities, women, the disabled, or employees over the age of forty, has not been contradicted by the plaintiffs.[17] This fact alone provides substantial evidence that the defendants did not have an intent to target employees for termination because of their age. *See Yatvin v. Madison Metrop. Sch. Dist.*, 840 F.2d 412, 416 (7th Cir.1988); *see also Coser v. Moore,* 739 F.2d 746, 751 (2d Cir.1984).

The Seventh Circuit has noted that judges must look behind an expert's ultimate conclusion and analyze the adequacy of its foundation. *Mid–State Fert. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989). If

17. In fact, even ranking committee members were to be selected on the basis of their race, age, sex and disability status, for purposes of forming ranking groups that are as diverse as possible. Defs.' App. 98, Morris Dep. at 122.

the factual context makes the claim implausible, then the plaintiff must provide more persuasive evidence than would otherwise be necessary. *Id.* For example, it makes no sense that a company that went to great lengths to evaluate the effect of a proposed downsizing on all aspects of its operation, including its EEO compliance, would deliberately choose a criterion designed to discriminate against a protected class of workers. *See Coser,* 739 F.2d at 751 (existence of comprehensive affirmative action program is antithesis of pattern and practice discrimination and evidence of an intent to eliminate discrimination) (cited with approval in *Sears Roebuck,* 839 F.2d at 351). This factual context makes the plaintiffs' claims here implausible, and, consequently, heightens the level of proof necessary to be considered sufficient to raise a genuine issue of material fact.

## B. PATTERN OR PRACTICE CLAIMS

In *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court found that a pattern or practice of race discrimination had prevented minority drivers from obtaining line driving positions on an equal basis with white drivers. *Id.* at 335, 97 S.Ct. 1843. The Court noted that to make out a prima facie case, the plaintiffs had to show by a preponderance of the evidence that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. 1843. The United States met that burden with statistics indicating that of a total 6,472 employees, five per cent (5%) were Negro, and 4% Hispanic; but, with line drivers, only 0.4% were Negroes and 0.3% were Hispanic, and all the Negroes had been hired after the litigation had commenced.

The Teamsters argued that statistics alone can never prove the existence of a pattern or practice of discrimination, or even establish a prima facie case. The Supreme Court noted that the plaintiff had bolstered its statistical evidence with anecdotal testimony of forty specific instances of discrimination. *Id.* at 338–39, 97 S.Ct. 1843. For example, witnesses testified that minority applicants were given false or misleading information, their applications were ignored, or they were just not considered for the line driving jobs. *Id.*

at 339, 97 S.Ct. 1843. Even so, the Court stated, it is unmistakably clear that "statistical analyses have served and will continue to serve an important role" in discrimination cases. *Id.* at 339, 97 S.Ct. 1843. Statistics are not irrefutable, the Court cautioned, and they may be rebutted. *Id.* at 340, 97 S.Ct. 1843. Moreover, their usefulness depends on the surrounding facts and circumstances. *Id.* Implicit in this analysis is that, under the right circumstances, powerful statistical proof may suffice by itself to establish a prima facie case.

The plaintiffs here have a pattern or practice case that is founded virtually on statistics alone. The statistical evidence, however, is not as compelling as that noted in *Teamsters,* and it is weakened by substantial defects noted by the defendants. One of the most significant is the fact that the plaintiffs' expert based his analysis on an assumption that was inconsistent with the record, rendering that portion of the statistical study not probative of discrimination. *See Coser,* 739 F.2d at 751. Thus, it must be bolstered by other evidence to meet the sufficiency requirement. The non-statistical evidence offered by the plaintiffs includes an article by Srikumar S. Rao, an article by Adam Lashinsky, an uncertified copy of an alleged speech on the "Breakthrough! Leadership" project, a copy of an Ameritech Bulletin dated September 3, 1992, which was a deposition exhibit, a transcript of a videotaped interview (Defs.' Exs. 125, 126), and a transcript of an Ameritech Corporation video. Pls.' Exs. 4, 5, 6, 8, 12, and 13. The Court will evaluate each of these offerings in turn.

In the Rao article, a statement was attributed to Ameritech Corporation chairman of the board and chief executive officer, Bill Weiss ("Weiss"), to the effect that if Ameritech did not change it could become a "tired old company." Ex. 4 at 2. However, in his deposition Weiss said that the industry was changing, there was competitive entry at every level, and the board's task was to learn what must be done to make Ameritech a continuing successful company. Pls.' Ex. 41, Weiss Dep. at 35–36. He was not sure who had made the "tired old company" remark, but he understood it to mean that if Ameri-

tech "continued to operate simply as we had in the past, the others would take the more lucrative parts of our market away from us." *Id.* at 36. Even viewed in a light most favorable to the plaintiffs, this remark could only be seen as a criticism of Ameritech's continued operation as a regulated monopoly.

The "tired old company" comment was repeated in a speech allegedly given by Weiss on October 21, 1992, in which he said the board of directors was very supportive of the efforts to avoid becoming a "tired old company that no longer is competitive as our marketplaces move away from us." Ex. 13. Again, he appears to be referring to the general marketing strategies used by the corporation, rather than the age of its employees. It would not be reasonable to construe it otherwise. Even if it could be construed as age-related bias, Weiss was not a decision-maker with respect to ASI's CRESP process for resizing, and was in fact remote from the process. Thus, a remark by him would not support a finding of age discrimination by ASI. *See Chiaramonte,* 129 F.3d at 402; *Oxman v. WLS–TV,* 12 F.3d 652, 657 (7th Cir.1993); *Monaco v. Fuddruckers, Inc.,* 1 F.3d 658, 660 (7th Cir.1993). This remark adds nothing to the statistical evidence.

■ In an article written by Adam Lashinsky, Weiss is alleged to have described the four men he appointed to lead the Breakthrough! Leadership project as "young team captains." Pls.' Ex. 5. In his deposition Weiss said he did not recall dubbing the four leaders as such. *Id.* at 56. Despite his failure to recall the remark, the defendants have admitted that Weiss used words to that effect. Pls.' Ex. 30, Answers to Interrog. at 8. Such a remark, taken in the context of announcing a change in direction for the company, does not constitute evidence that Weiss planned to terminate employees at ASI because of their age. Rather, it seems to reflect the idea that these men were to lead the effort to become more competitive. It also reflects the perspective of a man who was sixty-three years old at the time and referring to men who were primarily in their forties. *See* Pls.' Ex. 41, Weiss Dep. at 30; Pls.' Ex. 5. A reasonable factfinder would have to make several unusual inferences to conclude from this statement that Ameritech planned to force its subsidiaries to arbitrarily fire older workers. The remark also suffers from being too remote from the decisions at issue.

The uncertified, unverified, and almost unidentified, document titled "A Breakthrough! Chronology," includes an alleged statement by Weiss that Ameritech would make the tough decisions necessary to achieve its goals, but would be honest, compassionate and caring because it affected the livelihood of its employees. Pls.' Ex. 6, "Breakthrough! Chronology" at 1. It is unclear how this comment, if in fact made by Weiss, possibly could be construed as indicating the desire to get rid of older workers, because of their age, and bring in younger ones. It is similarly unclear why plaintiffs cited a 1992 Ameritech Bulletin in support of the contention that Ameritech treated younger workers more favorably than older ones. The Court could discern no statement in the entire bulletin to suggest such a plan. Consequently, neither of these pieces of evidence would supplement the proffered statistical evidence enough to overcome its weaknesses, if it were to be admitted.

■ Other comments regarding age were allegedly made during an Information Technology Video Forum, held on September 10, 1993, by Jim Goetz, ASI's Director of System Integration Services in the Information Technology Department ("Goetz"). Goetz made the following statement during the videotaped discussion between company executives and employees calling in from remote locations:

> There are some of what I would call "professional skills" that we are looking for.... but part of these open positions are just our solid professional openings that we could recruit from college ... So some of them are special skills, professional skills where we are looking for resumes that already have the skills ... but some of this you'll see are just analysts, entry-level analyst jobs where we want to get back and start bringing in some folks that are under 45 years old.

Defs.' App. 126 at 4. According to plaintiffs, Goetz's comment about hiring folks under the age of forty-five is a clear indication of age-related bias.

Construed in the light most favorable to the plaintiffs, however, this comment appears to refer to one ASI executive's call for a resumption of hiring recent college graduates to fill positions that cannot be filled by current employees. The comment implies that ASI had not been doing so in the recent past. In fact, Goetz's testimony is that they had not. Defs.' App. 93, Goetz Dep. at 105–06. It says nothing about terminating older workers because of their age, nor does it support the inference that the only people to be hired from the outside would be under the age of forty-five. In addition, the statement was made more than one year after the decision to resize, and nearly ten months after the termination decisions affecting the plaintiffs. It was also made by someone who was remote from any of these decisions: to resize; which criteria to use; how deep to make cuts in each department; or who to select for termination. *See* Defs.' App. 93, Goetz Dep. at 86; App. 77, Hauf Aff. ¶ 15; App. 92, Vaughn Aff. ¶ 14; *see also Chiaramonte*, 129 F.3d at 397; *Oxman*, 12 F.3d at 657; *Monaco*, 1 F.3d at 660 (finding insufficient connection between statement of non-decision-maker and adverse employment decision); *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990) (a stray remark or slur is not by itself proof of actionable discrimination).

Even if it could be attributed to a decision-maker, Goetz's comment was subsequently clarified during the same interview. Defs.' App. 126 at 5. Goetz said that his comment was a reference to ASI becoming "open to hiring people from colleges again .... It is my view that hiring professionals is also something we are going to do and if that professional is of any age we're open to that as well." *Id.* Given that he called his previous statement stupid during a live broadcast to every Bell affiliate, and his prompt correction of his misstatement, it is unlikely that a reasonable juror would find this incident sufficient to attach an age discrimination motive to ASI's resizing plan. *Id.* Instead, this appears to be an isolated, stray remark, that at most indicates a willingness to hire recent college graduates, which is not evidence of an intent to target older workers for termination.

Plaintiffs also cite a remark made by Thomas Reiman ("Reiman"), who was the president of Indiana Bell, about the need to continue hiring new people during the downsizing, including hiring "young crazies" to keep the business from drying up. Pls.' Ex. 50, Reiman Dep. at 299. Although this remark possibly could be interpreted as an indication of the intent to replace the terminated employees with "young crazies," it cannot be attributed to any decision-maker at ASI. Instead, it falls into a general category of stray remarks that by themselves do not prove actionable discrimination, even if repeated. *See Shager*, 913 F.2d at 402. During his deposition, Reiman explained that he was referring to a subset of the workers they needed to hire to maintain diversity, and by "young crazies" he meant people who did not think the same way that Reiman might think, or that an engineer might think. Reiman Dep. at 299. According to Reiman, who was one of Weiss' team captains for the "Breakthrough! Leadership" project, the resizing program was a response to the change from monopoly to a competitive environment. *Id.* at 227. "One of the things that stood out was that there was a big distance between the front line person who dealt with the customer and where the authority and the information in the company resided. And so the effort was on the one hand to reduce that bureaucracy ... and on the second to get our costs more in line." *Id.* at 227–28.

The size of the workforce was also a problem, Reiman noted, both from the cost standpoint and from an efficiency standpoint. *Id.* at 230. For example, a business office service representative would have to go through five layers of management to get to someone who had the authority to say "yes" to a customer. *Id.* The goal of the resizing was to reduce that to only one or two layers, "or even better still, to empower that person on their own to do it." *Id.* When Reiman's remarks are viewed in this context, it becomes apparent that the resizing was directed at a corporate restructuring in which many people in positions known as "middle management" would be terminated. That a disproportionate number of those people might be over the age of forty does not make

the entire resizing program an intentional plan to discriminate against older workers.

But that is exactly what the plaintiffs would have the Court and a jury believe. According to the plaintiffs, the use of the criterion "growth potential" was intended to weed out older workers who had already achieved most of their potential in terms of promotions. In support of this contention, plaintiffs point to the deposition testimony of ASI industrial psychologist, Gary Morris, and that of Neal Kulick, who worked for Ameritech Corporation in a similar capacity. Kulick's deposition, however, reveals no underlying intention to weed out older workers, nor does he even admit to suggesting the use of growth potential as a criterion. *See* Pls.' Ex. 51, Kulick Dep. at 31–32. In his deposition for this case, Morris indicated that he got the idea of using "growth potential" from discussions he had with Kulick, and that the reason for including it was that the business was changing drastically, and they thought it would be useful to review people based on their ability to change. Pls.' Ex. 45, Vol. 3 Morris Dep. at 540. Adaptability is a reasonable job requirement in an industry that is undergoing drastic changes.

In a deposition for a related case, Morris discussed earlier testing of the proposed CRESP selection criteria, in which he found that older people tended to be ranked lower on the "potential" criterion. Pls.' Ex. 46, Morris Dep. at 110. Although he did not know what caused such a result, Morris speculated that the reason for the discrepancy was that older people "have less potential to move upward. They are at the position that they basically should be." *Id.* If growth potential is interpreted merely as advancement potential, Morris' guess might be on target. Nevertheless, that is not how he had intended growth potential to be used during the resizing, nor is it how it was defined in the program. *See* Pls.' Ex. 45, Vol. 3 Morris Dep. at 540.

In the CRESP training manual, published and used during the training of CRESP ranking committee members, Morris included a complete description of the plan and its selection process. Ex. 46, Morris Dep. at 115. The manual, which was the only written document on the CRESP process, defines "growth potential" as advancement potential and the potential to grow and change with the business. Pls.' Ex. 7, at ASI 012606; Defs.' App. 98, Vol. 1 Morris Dep. at 127. That interpretation is further supported by testimony from defendants' expert, Robert A. Ramos, who testified about validity studies performed by Ameritech's predecessor, AT & T, for whom Ramos had worked, on the management potential and appraisal plan developed by AT & T. Defs.' App. 106, Ramos Report at 4, ¶¶ 6–9. That plan was passed on to all Bell operating companies, which included the current Ameritech companies. *Id.* ¶ 10. The "potential appraisal" concept in use at ASI incorporated the key components of the former AT & T potential appraisal plan. *Id.* ¶ 11.

The training manual also specifically instructs the ranking committee members, and anyone else involved in the CRESP process, that race, sex, age, and disability information will not be provided and should not be considered. *Id.* at ASI 012605. The stated purpose for the CRESP process was to achieve "fair/efficient identification of personnel." Pls.' Ex. 7 at ASI 012583. Other criteria to be used for ranking the employees included job skills, experience and knowledge, performance (immediate/recent and past), and leadership skills. *Id.* Those criteria were broken down into further detail in the manual. For example, with the "leadership" criterion, reviewers were to evaluate an employee's "customer focus, empowerment, integrity, leadership, openness of communication, quality, respect for people, teamwork and value of diversity." *Id.* at ASI 012606. Considering that the goal of the resizing was to become more efficient, reduce layers of middle management, and increase competitiveness, these criteria seem logically related to accomplishment of those goals.

The actual evaluations were performed by all members of a CRESP ranking committee, composed of other managers within the employee's department who were one or two levels above those being reviewed, and at least one of whom was comfortable talking about the performance, experience, and skills of any given employee to be reviewed. *Id.* at ASI 012587; Defs.' Ex. 98, Vol. 1 Morris Dep. at 122. They conducted the rankings

based on criteria that would have been familiar to each member as it was very similar to that used for the annual or periodic evaluations of the various employees under their supervision. Defs.' App. 78, Kledzik Aff., ¶¶ 12–13; Defs.' App. 65, Rankin Aff. ¶¶ 27–28; Defs.' App. 81, LaCrosse Aff. ¶¶ 10–11; Pls.' Ex. 45, Vol. 3, Morris Dep., at 544. Each member's vote on a manager's relative rank was equal to every other member's vote, and at the time of the rankings no member of the ranking committee, including the coordinator, knew the number of employees that would be cut from the given CRESP ranking group. Defs.' App. 82, Little Aff. ¶¶ 16–18; Defs.' App. 56, Arner Aff. ¶ 18. To the extent possible, the composition of each ranking committee was to be proportional in terms of age, gender and race, and their size was to be kept to a minimum. Pls.' Ex. 7 at ASI 012587. Departmental Coordinators were responsible for creating and training the ranking committees. Defs.' Ex. 98, Vol. 1 Morris Dep. at 122.

The CRESP process involved two stages of assessment. The first, Stage I, identified employees who were "at risk," usually because of his or her relative ranking based on objective criteria from employment records. That mechanical evaluation was conducted by staff in Morris's office, and it was based on merit pay received by the employee for 1990 and 1991. Defs.' App. 98, Vol. 1 Morris Dep. at 94–96. Morris used actual merit pay information from the employees' files to rank them in relation to others within their own departments and in their salary grades. *Id.* at 96. After completing this mechanical ranking, Morris passed the lists on to the departmental coordinators for refinement.[18] *Id.* at 97–98. That refinement included determining if anyone was mistakenly ranked low because of only receiving a partial year of pay, being a recent transfer or hire, or if they possessed special skills that could not be replaced. *Id.;* Pls.' Ex. 7, CRESP Manual at ASI 012637.

After this Stage I refinement was completed, the departmental coordinators drew a line on the lists "at a point that would incorporate twice as many people as they believed would need to be separated" based on the

work force projections. *Id.* at 98. These projections came from the Task Force recommendations, which were based on their study of the work performed by ASI managers in the various vice presidential organizations. The Task Force had determined what work or functions could be eliminated, restructured or reduced without harming customer service or impeding ASI's ability to compete or expand into new markets. Defs.' App. 75, Catlow Aff. ¶¶ 5, 9; Defs.' App. 60, Helvey Aff. ¶ 2.

The Task Force made recommendations in August of 1992 about the amount of work that could be eliminated or reduced from each department at various levels of risk to customer service. Catlow Aff. ¶ 9. The members of the Task Force based their recommendations about work elimination and cost reductions solely on the work content and not on the characteristics of any of the specific employees performing the work. Defs.' App. 92, Vaughn Aff. ¶ 8. Because ASI could not control which employees might accept a voluntary retirement, the company decided it had to implement an involuntary component to the resizing. Catlow Aff. ¶ 11. That component would enable ASI to determine and select for separation "the least qualified management employees in each of the specific functional areas," and ensure that the "level and quantity of cuts within those functional areas [would] generally follow the recommendations of the work elimination task force." *Id.*

After deciding in early August to include an involuntary aspect to the resizing program, ASI subsequently assigned Morris to develop a workforce reduction plan that was intended to be as objective as possible. *Id.* ¶ 12. That is what he did. For example, in Stage I of the CRESP plan historical merit pay awards were used because such awards were based on the relative ranking of employees against their peers before any workforce reductions were contemplated. *Id.* ¶ 12.

The CRESP groupings were constructed within departments and salary grades according to the specified guidelines listed in

---

**18.** Anyone for whom ASI had insufficient or no merit pay information was automatically passed

on the Stage II for further review. Pls.' Ex. 7, CRESP Manual at ASI 012595.

the training manual. Defs.' Ex. 98, Vol. 1 Morris Dep. at 100; Defs.' App. 56, Arner Aff. ¶¶ 6–8; Defs.' App. 57, Coe Aff. ¶¶ 6–8. They were created by grouping all those in a given salary grade who had interchangeable or homogeneous skills. *Id.* They did not necessarily have the same job, but their skills were interchangeable or they had similar functions. *Id.* The groups would possibly cut across geographic boundaries and they varied in size from just a handful, to as many as 800 in one group. Defs.' Ex. 98, Vol. 1 Morris Dep. at 101–02. The manual stated that CRESP groups were to be homogeneous, or at least comparable, they should not cross "level" or departmental boundaries, and they may be formed geographically.[19] Pls.' Ex. 7 at ASI 012589. CRESP groupings were the foundation for the work in Stage II. *Id.* It was the bottom thirty to thirty-five per cent of the people in any given CRESP group that moved on for review in Stage II. Defs.' Ex. 98, Vol. 1 Morris Dep. at 116.

In preparation for Stage II work, CRESP departmental coordinators were appointed by the department head, who was a vice president in charge of a specific area. *Id.* at 108. Generally, the vice president was asked to identify a person fairly high in salary grade, who was very credible in the department, and whose word would be respected, to serve as a departmental coordinator. *Id.* at 106. In Stage II, the coordinators assembled ranking committees with as much diversity with respect to age, race, gender and disability status as possible. *Id.* at 122. The ranking committee members were instructed on the process and about the criteria for ranking the employees in their CRESP ranking groups, and using those criteria they arrived at a consensus on the relative rank of each in relation to the others. *Id.* at 131. Once this task was completed, the CRESP ranking committee members' duties were concluded. *Id.*

The lists then went to the department head and perhaps a departmental committee for purposes of drawing a line below which

employees would be selected for separation. *Id.* No ranks were changed after the ranking committee was finished. *Id.* However, the department head reviewed the results of the rankings using an "overlay identifying the race/sex/age and disability of individuals, and had the right to challenge any suspicious placements." Pls.' Ex. 7 at ASI 012637. Adverse impact statistics were calculated for each CRESP group, and for the department as a whole, if possible. Highly disparate or suspect situations were to go back to the working committee for further review. *Id.* The department head also reviewed for surpluses, workforce gaps, and in relation to the Task Force recommendations. *Id.* After these reviews, the department head drew the line, and all below the line were to be recommended for separation. *Id.* at ASI 012638.

The process did not end there, however, for the separation recommendations were then passed on for review by the company's executive committee. That committee consisted of the president of the company, the vice president of human resources, a legal representative, and the industrial psychologist. *Id.* at 012588. Again, the employees targeted for separation were reviewed in terms of race, sex, age and disability status, and any highly disparate, or suspect situations were to be reviewed in depth with the department representatives. *Id.* at ASI 012639. Only then could the final separation decisions be made. *Id.*

The plaintiffs have presented no evidence to contradict defendants' proof that the CRESP Manual was an accurate description of the process used for selecting employees for separation from employment. Nor is there any evidence from which a reasonable factfinder could conclude that the process described in the manual was ignored, or that any part of it was omitted. In addition, no evidence has been presented that anyone involved in the process disregarded the instruction about not considering age, sex, or any other protected characteristics when

---

**19.** The definition of comparability in the Manual was that people could be transferred from function to function or job to job with minimal loss in productivity. Pls.' Ex. 7 at ASI 012589. That is, one person could become proficient in another person's job within six months, or with minimal training, within six weeks. *Id.* Basically, it meant that the same general skills, experience, and knowledge were required of all jobs within a group. *Id.*

evaluating employees. There were a total of 685 managers involved in the CRESP ranking process, many of whom were at least age forty or more. Defs.' App. 63, Morris Aff. ¶ 11, Ex. G. The plaintiffs have not offered testimony from any of those rankers to support a finding that the criterion of "growth potential" was used as code to allow for discrimination against older workers. In light of all of the above, the Court finds that the plaintiffs' evidence was not sufficient to establish a prima facie case of pattern or practice discrimination.

Even if it was, however, when a work force reduction is a factor in the decision to terminate an employee, the most common legitimate reason offered for the discharge is the work force reduction. *Barnes,* 896 F.2d at 1465. A "work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id.* The reasons for the reduction may influence the selection process for identifying workers to be discharged. An obvious example would be, if an employer decided to eliminate an entire product line, the most likely workers to be selected for termination would be those whose job skills were only useful to the employer for making the discontinued product.

A more subtle situation exists when, as here, the defendant decides to resize to improve efficiency, customer service, and increase its competitiveness. Under these circumstances, factors used for making the termination decisions would need to relate to those goals. In either case, a plaintiff counters the defendant's explanation for the selection criteria by showing that such criteria were not genuine job requirements, or were inconsistently applied to others. The Court has already found that defendants' criteria were logically related to their resizing goals. However, plaintiffs neither attack the selection criteria as unrelated to the business needs driving the resizing, nor do they show that it was inconsistently applied. Instead, they argue that one of the criteria, "growth potential," had a disproportionately negative impact on older workers, and that defendants knew it would when that criterion was selected for the CRESP program. By including that criterion, they argue, defendants allowed the process to be tainted.

In other words, plaintiffs would have the factfinder conclude that the impact occurred because the selection process was tainted, either by the actions of the individual decision-makers, or by some systemic defect, such as a criterion designed to target the older workers. As already noted, for that theory to succeed, the factfinder would also have to attribute the taint in the selection process to a conscious and deliberate choice by the defendants.

To support a finding that the process was tainted by the decision-makers' bias, the factfinder would have to infer that most of the hundreds of managers involved in the CRESP ranking process 1) had the means to discern the ages of each of the workers in their groups, 2) ignored the specific instructions from the defendants not to consider age, sex, race, or disability status when making their evaluations, Pls.' Ex. 7 CRESP Training Manual, at ASI 012605, and 3) consciously attempted to rank older workers in the CRESP group lower than the younger workers. It would also require a finding that the rankers somehow knew how many employees would be terminated in the CRESP groups they were ranking, so they could place older workers below that line.

Moreover, the factfinder would have to determine that the various department heads, departmental committee members, and any other decision makers, knew and considered the relative ages of the employees on the ranking lists, and used that knowledge when determining, and approving, the percentages of employees to cut in each of the CRESP groups. Because these managers were charged with the responsibility of questioning any rankings that appeared to violate a federal statute, *id.* at ASI 012637, the factfinder would likewise have to find that they deliberately ignored their responsibility. Finally, the company's executive committee, comprised of the president, the vice-president of human resources, a legal representative, and an industrial psychologist, was required to review the departmental separation recommendations for affirmative action and equal employment opportunity purposes. *Id.* at ASI 012586, 012639. The factfinder would have to determine that this decision-making

body knew and considered the ages of those selected at the departmental level, or was satisfied that the ages had been considered at earlier stages, and then disregarded its charge of ensuring compliance with federal laws. The plaintiffs have offered no evidence of any of these facts.

Instead, they seek to prove taint by pointing to an alleged systemic defect: the use of a criterion for evaluating workers that was negatively correlated with age. To prove intentional discrimination with this defect, plaintiffs would have to prove that Morris, who designed the CRESP process, deliberately chose that criterion *because of* its negative impact on older workers, not in spite of it. Moreover, because of the number of criteria used to evaluate the employees, the factfinder would have to find that the suspect criterion was given more weight by the defendants, or that it had such a strong negative effect on older workers that adding weight would be unnecessary.[20] Even then, to constitute a violation of the ADEA, Morris would have to have weighted that criterion *because of* its known adverse effect on older workers. Again, the plaintiffs have offered no evidence of anything but Morris's knowledge of a potential adverse effect of that criterion on older workers. *See* Pls.' Ex. 46, Morris Dep. in Bauer Litigation, at 92, 110 (describing a "small correlation between age and ranking . . . the lower rank [sic] there tended to be a little bit higher age"; "it was due to the . . . relationship between age . . . and the potential appraisal piece").

▮ Another theory suggested by the plaintiffs is that ASI decided to resize in order to reduce the number of older workers in its employ. In support of this theory, they offer the fact that when the initial announcements were made about the resizing program, ASI spokespersons estimated that 15% of the workforce would be eliminated. When all was over, nearly 20% of the workforce was cut. *See* Pls.' Ex. 3, 37; Defs.' App. 104 at 7. These two facts, according to the plaintiffs, give rise to the inference that ASI lied about its intent in an attempt to cover for intentional age discrimination. The Court

finds that, at most, ASI's initial estimates of the percentage of the workforce that would be separated by the voluntary and involuntary resizing program, indicates that the company may have underestimated the number of workers who would opt for early retirement. Because the two components of the program occurred simultaneously, ASI had control over only one-half of the process. It could guess, but not accurately predict, how many workers would accept the early retirement.

An additional factor that weakens this theory is that ASI employed a decentralized decision-making process during the involuntary part of the program, and it allowed the vice presidents to use their judgment about percentages to cut based on the Task Force recommendations. All of these factors provide more likely explanations for the discrepancy between the initial predictions and the ultimate results. Plaintiffs have offered nothing more than the fact that the results were different in support of their contention that the defendants lied about their intent. That is not sufficient to raise a genuine issue of material fact.

Other support plaintiffs offer for this theory includes the isolated statements made by several ASI and Ameritech executives about the company being "old" and about the need for young people to be hired again. *See* Pls.' Ex. 4, 5, 6, 8, 12, 13, 50. However, even though seemingly ambiguous, these comments are rendered crystal clear when considered in context, as the Court has already noted. For example, plaintiffs cited a statement by Reiman that they interpret as indicating that the goal of the resizing was to ventilate the business to make room for younger workers. Pls.' Ex. 50, Reiman Dep. at 299. They suggest that Reiman's comment was code for firing older workers.

In the context of the discussion, however, which was a response to a question about whether current employees could still expect to get promotions, Reiman agreed that at the same time that some people were being fired, others would be promoted, or hired from the

---

**20.** The Court notes that when "growth potential," the suspect criterion, is balanced against the other criteria, job skills, experience, knowledge, leadership ability, it appears likely that its

negative effect on older workers would diminish, if not disappear. *See* Pls.' Ex. 7, CRESP Training Manual, at ASI 012605.

outside. His statement was, "We have to find a way to continue to hire people." *Id.* at 298. He also said that such hiring should include a diversity of people, which included a subset of "young crazies." *Id.* at 298–99. He defined young crazies as people who "didn't think the same way that I might think or that an engineer might think." *Id.* at 299. Another subset was people from other industries who had experience and specific skills that were needed. *Id.* When these comments are taken together, any ambiguity dissolves, and it becomes clear that Reiman was not talking about "ventilating" the business by firing older workers and hiring younger ones.

■■■ One other way the plaintiffs could support their pattern or practice discriminatory treatment claim would be to provide anecdotal evidence that shows that a younger employee with similar skills, experience, education and job performance was treated more favorably during the resizing than any given plaintiff. That evidence would have the result of supporting the weakened statistical evidence, if it were admitted. Yet, the plaintiffs have offered no evidence of such individual instances of discrimination between themselves and similarly-situated younger employees. To show that defendants had the actual intent to discriminate against them on the basis of their protected characteristic, the plaintiffs would have to present evidence other than that they had received "satisfactory" performance evaluations. They would actually need to show that they were similarly situated to the younger employee except for the protected trait. *See Coates,* 756 F.2d at 540.

In the absence of any evidence showing a general pattern, practice or policy of discrim-

inating against older workers, or of individual instances of discrimination, the plaintiffs have failed to produce sufficient evidence to establish a genuine issue of material fact for trial on this claim. Even if the statistical evidence the Court has already found to be inadmissible were added to the anecdotal evidence presented, it would not add much weight. Thus, the motion for summary judgment on the pattern or practice claims is **GRANTED.**

### C. INDIVIDUAL CLAIMS OF AGE DISCRIMINATION

Although plaintiffs have failed to show a pattern or practice of age discrimination that could create a presumption of discrimination in their individual cases, it is still possible that an individual plaintiff could prove age discrimination in his or her own discharge. Thus, the Court turns to a review of those claims and the evidence presented to support them. A summary of the types of proof offered by the various plaintiffs in their individual claims includes the following: 1) defendants acknowledge that plaintiffs have established a prima facie case; 2) defendants' pattern of discriminatory statements and conduct "strongly suggests intentional age discrimination"; 3) defendants have failed to give specific, detailed, non-discriminatory reasons for each plaintiff's termination; and 4) the "vague justifications" offered by the defendants are "plainly pretextual" when compared to plaintiffs' actual job performance and defendants' contemporaneous statements to them. Pls.' Brf. In Oppos. To Defs.' Mot. For Sum. J. On Ind. CLS. Of Age Discrim. at 1. For purposes of the motion for summary judgment on the individual claims only, the Court will assume the establishment of a prima facie case for each plaintiff.[21]

---

21. The Court has serious doubts about whether plaintiffs each have satisfied the fourth prong, as no evidence has been presented of instances in which a "similarly-situated" and substantially younger worker received more favorable treatment than any particular plaintiff. *See Hartley,* 124 F.3d at 893 (ten-year difference in age is presumed "substantial" and when disparity is less, plaintiff must present evidence that employer considered his or her age to be significant).

If a plaintiff has not been singled out for adverse treatment, but is instead a member of a group of employees who are terminated during a RIF, he or she has a different burden for estab-

lishing a prima facie case. Here, the selections depended on the plaintiffs' relative rankings against other members of their CRESP groups. To show less favorable treatment, they would need evidence that a substantially younger employee received a less stringent evaluation, or was tied in rank with a given plaintiff and only the plaintiff was discharged. Or, if the plaintiff and a substantially younger employee were both ranked "below the line," but the plaintiff was the only one discharged. These examples demonstrate the difficulties in applying the *McDonnell–Douglas* approach in case involving a large, simultaneous reduction in force. *See Kariotis v.*

■ In a RIF case, the employee proves his or her prima facie case by showing that he or she was a member of the protected group (over 40); was performing according to the employer's legitimate expectations; was terminated or demoted; and others not in the protected class were treated more favorably. *King*, 960 F.2d at 621. This variation in the traditional ADEA case was developed because in RIF cases terminated employees are often not replaced. *Id.* However, as noted earlier, when the defendant has carefully documented the reasons for selecting a particular employee during a bona fide RIF, the defendant has little trouble providing a legitimate, non-discriminatory reason for the discharge, and the presumption of discrimination will dissolve. That is because a court must deal with "small gradations, with an employer's subjective comparison of one employee to another, and it is incumbent upon [the court] to remember that what is at issue is not the wisdom of the employer's decision, but the genuineness of the employer's motives." *Testerman*, 98 F.3d at 304.

Upon review of the various affidavits and depositions filed by the defendants, the Court is satisfied that defendants have met their burden of explaining each termination. *See* Defs.' App. 57, Coe Aff. (Adams, Cotterman, Hayes, Holdeman, Shorts); App. 59, Hansen Aff. (Hunter, Barker, Bishop, Brinker, Jones); App. 61, Mason Aff. (Anderson); App. 65, Rankin Aff. (Howley); App. 66, Roberts Aff. (Langford, Williams, Worton); App. 74, Bollie Aff. (Bishop); App. 78, Kledzik Aff. (Barker, Jones); App. 79, Kruecher Aff. (Williams); App. 81, LaCrosse Aff. (Hayes); App. 82, Little Aff. (Holdeman, Shorts); App. 83, Lockwood Aff. (Todd); App. 87, Peters Aff. (Worton); App. 89, Resler Aff. (Klooze); App. 90, Sappenfeld Aff. (Barker, Brinker, Hunter); App. 91, Smith Aff. (Burkett). Consequently, the resolution of the individual claims will depend on whether the plaintiffs have summoned any evidence to support a finding of pretext.

■ As evidence of pretext plaintiffs offer their statistical evidence, the alleged discriminatory statements by various ASI, Ameritech, and Indiana Bell executives that

were discussed above, and the fact that of the total number "selected" for termination, 68.4% were forty or more years of age while only 31.6% were less than forty. None of this evidence will suffice to create a genuine issue of material fact on the issue of pretext. In the ordinary case, to show pretext at the summary judgment stage, a plaintiff must produce sufficient evidence from which a rationale fact-finder could infer that the employer *lied* about its proffered reasons. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995) (pretext does not mean mistake,. "[i]t means a lie, specifically a phony reason for some action."); *Schultz v. General Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir. 1994), *cert. den.*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). "There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Schultz*, 37 F.3d at 334 (quoting *Kralman v. Illinois Dep't of Veterans' Aff.*, 23 F.3d 150, 156 (7th Cir.1994). Consequently, absent some showing of discriminatory motive, courts do not question an employer's good faith business decisions. *Id.*

In a RIF case, the proof needed to show pretext will vary in proportion to the size of the RIF, the decisional process used, and the criteria employed for selecting·employees for termination. *See Testerman*, 98 F.3d at 304 (in a RIF, the court deals with "small gradations, with an employer's subjective comparison of one employee to another"). *See also Oxman*, 12 F.3d at 658. The Court does not understand the plaintiffs to be seriously contending that the entire reduction in force was a pretext for age discrimination against any of them individually. Given the multiple safeguards against discrimination that were built into the company resizing program, the burden of proving pretext under this theory would be onerous. Instead, each plaintiff attempts to show why his or her selection was not the result of the age-neutral application of the defendants' CRESP process, but was in fact because of his or her age. To accomplish this task, a plaintiff must come

forward with "specific evidence from which a finder of fact may reasonably infer that the employer's proffered reasons [for the termination] do not represent the truth." *Weisbrot v. Medical College of Wis.*, 79 F.3d 677, 682 (7th Cir.1996).

■ However, when an employer articulates a non-discriminatory reason for discharging a plaintiff, it is not the province of the court "to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997). Consequently, any evidence offered by a given plaintiff that merely tends to show that his or her selection for termination was unwise, unfair, or even a mistake, will not suffice to show pretext. Likewise, a plaintiff will lose if his or her evidence only tends to support a finding that the defendant's reasons were "foolish or trivial or even baseless." *Hartley*, 124 F.3d at 890. These limitations render a plaintiff's burden at the pretext stage in a RIF somewhat heavier.

Turning to the evidence offered by the plaintiffs about the real reasons they were discharged, the Court notes that most of it consists of the plaintiffs' performance ratings prior to the decision to resize, allegations that they were ranked by managers who did not directly supervise them, or among employees they did not know, that they were selected for termination based on concerns that had never been voiced to them, or that they were more qualified than younger co-workers in their work groups who were retained. The plaintiffs also emphasize that rankers were instructed to destroy their notes taken during a ranking session, which plaintiffs suggest demonstrates an unlawful motive behind their actual rankings.

■ Initially, the Court observes that the plaintiffs' citations to statements and ratings on previous annual performance evaluations, without more, are irrelevant to the issue of whether their relative ranking during the CRESP process was motivated by discriminatory animus. *See Sirvidas*, 60 F.3d at 378. This argument ignores the fact that the defendants had to choose from among many employees with similarly good annual ratings, to select those who were the least satisfactory, or weakest, for termination.[22] It also overlooks the fact that a given employee's performance, or the perception of his or her performance, may change over time, and an earlier rating of "substantially exceeds expectations," may not negate that employee's placement below the line in 1992. Moreover, even with a satisfactory evaluation, a plaintiff may have received feedback about perceived weaknesses that later were emphasized during the CRESP ranking sessions. *See e.g.* Pls.' Ex. 85, Brinker Dep. at 149–50, Ex. 88, Brinker 1991 Evaluation (told by Sappenfeld to improve listening skills), Defs.' App. 90, Sappenfeld Aff. ¶¶ 4, 17, 24 (Brinker was hard worker but had problems with interpersonal skills and teamwork, with a tendency not to listen all points of view and did not handle pressure well).

Plaintiffs have confused the cases that require an employer to explain why one employee was fired over another, with the situation at hand in which the reason any given employee was terminated is that he or she was evaluated by a group of managers using criteria equally applicable to all and was found to be less valuable to the company than similarly-situated co-workers. Under these circumstances, the degree of specificity a defendant needs to articulate to shift the burden to a plaintiff is measured by how detailed, specific, and neutral the process was for selecting employees for termination. Here, defendants either point to documents recording the results of the various CRESP

---

**22.** The plaintiffs also assert that defendants' explanations were not specific enough to allow the burden to shift back to them to show pretext. This argument is another example of the poor fit between the *McDonnell–Douglas* framework and a large RIF. The Court considers the defendants' evidence, in the form of affidavits describing the process used and the reasons for each plaintiff's selection, in the context of the CRESP training materials. The Manual contained very specific criteria by which each manager being evaluated was rated. Those ratings were performed by a group of managers, many of whom were familiar with the employee's work, in an environment in which the rankers' decisions were being monitored for fairness and absence of disparate impact on protected classes of workers. In light of the decentralized process actually used, the plaintiffs' assertions just do not add up.

ranking committees' work, affidavits from managers who were familiar enough with each plaintiff's work and ranking to explain the rank each received, or both. That is sufficient to shift the burden of production to the plaintiffs. The Court sees no need for defendants to further recount the specific reasons that went into the ranking group's decisions.

The CRESP process defendants have described was as comprehensive, fair, and unbiased a system as they could make it. The plaintiffs were evaluated by more than 680 managers, each of whom had only one vote, and none of whom either knew or considered the ages of those being ranked. They also did not know where the ultimate line would be drawn for their ranking group. Defendants have produced sufficient explanations for each plaintiff's termination, and that shifts the burden to the plaintiffs to show pretext. *See Robinson,* 23 F.3d at 1164 (defendant's reliance on a forced ranking of employees being considered for discharge during a RIF "does not hint of age discrimination"). In *Robinson,* the plaintiff had argued that the criteria used in the forced ranking were unfair to him, masking his strengths and highlighting his weaknesses, but the court found that argument irrelevant. *Id.* Even if a forced ranking results in a "mistaken assessment" of an employee's value to the company, that fact alone does not "signal cognizable discrimination by the company." *Id.* "Misguided and unfair personnel assessments are not actionable under the ADEA unless age played a role in the evaluation." *Id.*

The Court has already found plaintiffs' statistical evidence of a pattern or practice of discrimination to be inadmissible, and the remaining anecdotal evidence to be insufficient to create a genuine issue of material fact on that type of discrimination claim. Thus, plaintiffs may not employ the results of Wertheimer's statistical analyses in support of their individual claims, or any presumption from a pattern or practice finding, to prove that any individual plaintiff suffered discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *King,* 960 F.2d at 623 (establishment of company-wide pattern or practice of discrimination allows presumption that employer discriminated against a particular employee).

Even more harmful to each plaintiff's case is the fact that the plaintiffs have advanced no evidence that any similarly-situated, substantially younger, employee received a different type of evaluation from theirs. Instead, they attempt to demonstrate that the defendants' proffered reasons for their discharges were "manufactured" for this litigation. In support of that argument they claim that if those reasons were sufficient to justify a given plaintiff's termination, then that plaintiff should have been warned about his or her deficiencies and allowed to improve. However, a RIF is not an employee-improvement plan. On the contrary, it is a calculated reduction in the number of employees based on their ability to meet the selection criteria set for the RIF, and motivated by the business judgment that such action is necessary. If the employees are generally competent and performing satisfactorily or better, then the employer's job is to choose from among many good employees to keep the best, or fire the worst, depending on one's perspective. When the work force reduction involves as many terminations as occurred here, it is reasonable for an employer to devise a system for determining who its weakest employees are. That is what the defendants did.

As already noted, plaintiffs have presented no evidence that the system itself was tainted or biased against them because of their age. Instead, it selected them because their performance under the CRESP ranking criteria was not as strong as the performance of those against whom they were compared. The law does not require an employer to do anything more under the circumstances than what the defendants did. *See Kariotis,* 131 F.3d 672, 677 ("no federal rule requires just cause for discharges."). Defendants appeared to have made every effort to ensure the fairness of their selection system and they monitored application of the process to see that the rules were being followed. They included several checks to make sure that the system was not being used to target workers who were in protected classes, and

they documented the results of those assessments. It was enough.

Plaintiffs' individual attempts to "cast doubt" on the defendants' stated explanations of why they were selected come to naught. With evidence as strong as that provided by the defendants, a plaintiff must come forward with equally strong evidence of a lie to rebut it. They have not. Plaintiffs devote more than thirty pages of their brief in an effort to show why the defendants' justification for each of their terminations was pretextual. The evidence they offer includes their own testimony (by deposition or declaration), prior performance evaluations, an occasional letter of appreciation from a customer, and each plaintiff's own assessment of his or her value to the company in comparison with others. However, the question is not whether the plaintiffs had been performing satisfactorily, it is whether ASI honestly believed that each was selected for termination because he or she was among the weakest members in the relevant CRESP group. *See Sirvidas,* 60 F.3d at 378.

For that reason, "general averments of adequate performance by [the employee] are ordinarily insufficient to create a factual issue on summary judgment." *Id.* In fact, a claim that the employer acted incorrectly, undesirably, or even unfairly, toward the employee will not show that the employer did not honestly believe in the reasons for the discharge. *See Giannopoulos,* 109 F.3d at 411; *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.), *cert. den.,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996); *Kariotis,* 131 F.3d at 677. If the evidence shows that the defendant "honestly believed in the nondiscriminatory reasons it offered, even if those reasons are foolish or trivial or even baseless," then it cannot support a finding of pretext. *Hartley,* 124 F.3d at 890.

■ In *Kariotis,* the Seventh Circuit noted that a reason that is "honestly described, but poorly founded, is not a pretext as that term is used in the law of discrimination." *Kariotis,* 131 F.3d at 677. In short, "[n]o federal rule requires just cause for discharges." *Id.* (citing *Pollard v. Rea Magnet Wire*

*Co., Inc.,* 824 F.2d 557, 558 (7th Cir.1987)). Thus, a plaintiff's energy is misspent by attacking the results of the company's decisional process, unless he or she could point to facts suggesting that the process treated him or her differently because she was an older employee. *Id.* In the RIF context, an employee has to show that he or she would have survived the RIF but for his or her age. *Testerman,* 98 F.3d at 303. That means the plaintiffs here have to show that age "tipped the balance" in favor of discharge.[23]

■ With these standards as a guide, the Court will now consider each individual plaintiff's claim and supporting documentation for a finding of pretext. Kim Adams ("Adams") was forty at the time he was discharged. He was placed in CRESP group "Friduss IT (15)(d)" for evaluation under the CRESP process, where he was represented by Jackie DeMoss, a former supervisor, and where his ranking placed him in line for termination. Defs.' App. 57, Coe Aff. ¶ 26, Ex. D. Adams' evidence of pretext consists of his own declaration, excerpts from his deposition, his 1990 and 1991 performance evaluations, and three letters from customers expressing appreciation for his work. Pls.' Exs. 65, 66, 67, 68, 69. He also notes that in 1987 he received the "Circle of Excellence Award," and he received lump sum merit awards for 1990 and 1991. Pls.' Ex. 66, Adams Decl. ¶ 4. Finally, he contends that he was replaced by two younger workers who did not have the same technical expertise or problem solving skills as he had, based on the fact that they had asked "for his assistance in those areas." *Id.*

This evidence does not suffice to raise an issue of material fact for Adams. His previous awards, evaluations, and customer appreciation letters cannot rescue him from the effects of the CRESP evaluation, absent some evidence that the evaluation process was inconsistently applied to him. *See Perfetti,* 950 F.2d at 451 (circumstantial evidence that the criteria or rules were inconsistently applied is material to a finding of pretext). It is his performance under the CRESP cri-

---

**23.** Their task is more burdensome when the defendant has proof that the decision-makers did not know the ages of the employees they were evaluating, as is the case with most plaintiffs here.

teria that is important to this analysis, not how he was measured at some earlier time, when the purpose for the evaluation was entirely different. *Sirvidas*, 60 F.3d at 378 (isolated statements referring to employee's strengths do not demonstrate he was a stronger performer than others or that the reason given for his discharge is a pretext for discrimination); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.1994) (mere submission of materials from co-workers or supervisor indicating employee's performance was satisfactory does not create issue of material fact).

Moreover, Adams' contention that he was "replaced" by younger workers suffers from several flaws. First, the basis for his stating that these workers replaced him is not clear. There were fewer employees in his department after the resizing than there were before, so in one sense it could be argued that those who were retained "replaced" all those who were discharged. However, considering the defendants' evidence that the goal was to reduce the size of the ASI work force, it follows that the discharged employees were not replaced so much as they were no longer needed.

Second, Adams' declaration merely states that only he and a forty-three year old co-worker were discharged from his work group of seven co-workers, three of whom were younger than him ("between the ages of 25 and 35"), and that he had a heavier work load than anyone else in the department. Pls.' Ex. 66, Adams Decl. ¶¶ 7, 10. All of these statements reflect Adams' opinions, and none offer any facts to support the inferences Adams wants the Court to draw. Such averments do not place in question the honesty of defendants' belief that Adams was among the weakest employees in his CRESP group, which was based on his ranking by the CRESP ranking committee. *See Sirvidas*, 60 F.3d at 378 (in pretext analysis, question is whether employer honestly believed employee was weakest member of department). Finally, even if it were true that Adams had been handling more work than anyone else in his work group, he has presented no evidence that any decision-maker was aware of that fact. Adams' evidence fails to raise a genuine issue of material fact about pretext in his individual case.

■ Plaintiff Robert Anderson ("Anderson"), was forty-seven years old when he was discharged. His direct supervisor was Dick Rose, and Rose's supervisor was Jeff Mason. Defs.' App. 61, Mason Aff. ¶ 4. Rose did not prepare an evaluation of any of the employees he supervised for 1990, so in 1991 Mason told him that his merit pay for 1991 depended on him completing evaluations for everyone that year. *Id.* ¶ 6. Anderson's 1991 evaluation rated him as "satisfactory," but he did not receive an individual merit pay award for that year. *Id.* It was not uncommon for someone with a satisfactory rating not to receive merit pay, because it was rare in 1990 or 1991 for ASI managers to rate anyone as "unsatisfactory" or "below average." *Id.* Nevertheless, Anderson points to his satisfactory performance evaluations, and the fact that no one else on the ranking committee except Rose had any direct knowledge of his performance, as evidence of pretext. Pls.' Ex. 71, Anderson Decl. ¶ 6. He also argues that he was not ranked with his peers, and he was the only one in his work group who was terminated. *Id.* ¶¶ 5, 6.

Mason states that during 1991 and 1992 he "observed and was told that Anderson had resisted efforts to involve him in regional issues and projects and that he was concerned only with providing support to Indiana Bell." Defs.' App. 61, Mason Aff. ¶ 9. Because the finance group in which Anderson worked was becoming more regional and less state-specific in scope, Mason thought that "Anderson's focus on Indiana Bell negatively impacted his ability to develop leadership skills ... to develop new and more efficient ways" to do his work. *Id.* Moreover, Anderson was the only manager in his CRESP ranking group that was not known to the rankers, which Mason attributed to Anderson's refusal to work on regional projects. *Id.* ¶ 23. Mason's report to the CRESP ranking committee on these weaknesses must have led the group to rank Anderson lower than the others.

The Court finds that Anderson's own interpretation of his evaluations does not belie the evaluation conducted in his CRESP ranking group. His relative ranking against others

was affected by his perceived reluctance to become involved in regional projects, despite the fact that he supposedly asked his supervisors to be assigned to such projects. *See* Pls.' Ex. 71, Anderson Aff. ¶ 7. By his own testimony, Anderson can point to involvement in only one regional project, without specifying the date of that involvement, and he argues that Mason "was not personally familiar with [his] work or performance." *Id.* ¶¶ 6, 7. No evidence is presented that anyone on the ranking committee knew of Anderson's efforts to get involved in regional projects. Additionally, Anderson offers no facts on which the Court may assess his ability to know the level of familiarity Mason had with his work or performance, and he cannot overcome the strong evidence supporting his ranking in the CRESP ranking group. Anderson has failed to raise a genuine issue of material fact on his individual claim of discrimination.

■ Plaintiff Nancy Barker ("Barker"), who was forty years old at the time of her discharge, offers her own declaration, her deposition testimony, her 1990 and 1991 performance evaluations and a letter she wrote in November, 1992, asking for a reconsideration of her termination to support a finding of pretext. Pls.' Exs. 75, 76, 77, 78, 79. As with the other plaintiffs, Barker's prior evaluations cannot create a factual issue on the subject of her relative ranking in 1992. The defendants have provided evidence relating to Barker's CRESP ranking in several affidavits, but Barker contends that she was not adequately represented at the ranking session. *See* Pls.' Ex. 76, Barker Decl. ¶¶ 7, 9. She states that Kent Kledzik, who represented her on the CRESP ranking committee, was not her immediate supervisor, and he did not tell her about the weaknesses he saw in her performance on a project he observed. *Id.*

According to Kledzik, Barker "did not adequately follow up on issues" that were her responsibility and her work "lacked completeness." Defs.' App. 78, Kledzik Aff. ¶ 7. He also indicated he had received complaints from his peers about "Barker's lack of leadership" on the project. *Id.* Barker has offered no evidence that would contradict this testimony other than her own assertion that Kledzik did not tell her this before. Tom

Sappenfeld, who was on Barker's ranking committee, said he had worked with her on the project Kledzik mentioned, and he had been "disappointed with the quality of her work performance and leadership abilities." Defs.' App. 90, Sappenfeld Aff. ¶ 20. It is undisputed that Barker's supervisor was out of town during the time she was ranked, but a short summary of his observations were read to the ranking committee. Defs.' App. 78, Kledzik Aff. ¶ 14. Given the negative comments by Kledzik and Sappenfeld, it is not surprising that Barker did not survive the "small gradations" in comparisons among workers in the CRESP ranking group. The remainder of Barker's allegations do not suffice to create a factual issue on the genuineness of the defendants' motive for her ranking and subsequent termination.

■ Sandra Bishop ("Bishop") was forty-two when she was discharged as a result of the resizing at ASI. Pls.' Ex. 81, ¶ 2. In support of her claim that the reason given for her termination was a pretext for discrimination, she offers her own declaration, in which she states that she had satisfactory performance evaluations in 1990 and 1991, and that she received a lump sum merit pay award in 1991. *Id.* ¶¶ 4, 5. She also avers that the person who represented her on the CRESP ranking committee, Ron Bollie, had only been her supervisor for six months. *Id.* ¶ 7. Bollie acknowledged the brevity of his supervision and deferred to Bishop's previous supervisor, Sandra Swanson, who gave a presentation on Bishop's job performance. Defs.' App. 74 ¶ 9. In her brief, Bishop suggests that because Bollie's affidavit does not report the substance of Swanson's presentation, she is left to speculate what it was. However, even if that is true, it does not suggest that she was treated less favorably because of her age. Bishop has offered almost no evidence by which to create a genuine issue of material fact in her claim of discrimination.

■ Thomas Brinker, who had more than thirty years of service with ASI and Indiana Bell, transferred from Indiana Bell to ASI in May, 1991, at which time he was supervised by Tom Sappenfeld. Pls.' Ex. 86, Brinker Decl. ¶ 4. In support of his contention that

his ranking was a pretext for age discrimination, Brinker offers his deposition, his 1990 and 1991 performance evaluations, and his own declaration, to which he attached samples of his work product. Pls.' Exs. 85, 86, 87, 88. Brinker challenges Sappenfeld's statements that he lacked good interpersonal skills, that he needed to listen to other points of view, and that he had problems with planning and organizing, because of statements Sappenfeld made in Brinker's 1991 performance evaluation. Specifically, Sappenfeld wrote, "Tom is very good at organizing and prioritizing heavy volumes of work." Pls.' Ex. 88, 1991 Perf. Eval. However, as the Court has already noted, this same evaluation also indicated that Brinker needed to work to improve his listening skills in 1992. *Id.* In his deposition regarding this comment in his evaluation, Brinker said he did not remember Sappenfeld talking with him about a problem with his listening skills, probably because he "didn't listen to him." Pls.' Ex. 85, Brinker Dep. at 149.

According to Brinker, the conflict between what Sappenfeld wrote in the 1991 evaluation about Brinker's organizational and planning skills, and the statement in his affidavit that he thought Brinker had problems with interpersonal skills and teamwork, demonstrates a manufactured reason for purposes of the litigation. The Court finds no conflict between the two, because one can have good organizational and planning skills and poor interpersonal skills. Also, the need for Brinker to work on his listening skills had been noted in the 1991 evaluation, and it was corroborated by Brinker's admission in his deposition that he "probably didn't listen" to Sappenfeld when the subject was raised. Sappenfeld also indicated that other people in the group he supervised had "stronger skill sets relating to leadership, teamwork, negotiation, organization, planning, and written and oral communications." Defs.' App. 90, Sappenfeld Aff. ¶ 4. Brinker has presented no evidence to contradict these statements and fails to raise a genuine issue of material fact on his discrimination claim.

■ Plaintiff Julie Burkett ("Burkett") was forty-seven at the time of her discharge, and she offers little support for a finding that the reason for her discharge was a pretext for discrimination. Her supervisor, Pamela Smith, represented her on the CRESP ranking committee. She reported to that group, and Burkett's 1991 performance evaluation reflected the fact that, in the fall of 1991 Smith had received complaints about Burkett. Defs.' App. 91, Smith Aff. ¶ 4. Specifically, Smith recalled that Burkett had failed to meet certain deadlines for her work, she had failed to attend meetings, and she "generated confusion in her work group." *Id.* After several attempts to counsel Burkett, including a formal meeting on her performance in November 1991, Smith wrote in the 1991 evaluation that Burkett needed to "substantially improve" her performance in meeting deadlines and following through on commitments in 1992. *Id.* ¶ 6. Shortly thereafter, Burkett told Smith that she thought some medication she was taking caused her to have difficulties with concentration, and she planned to discontinue it. *Id.* ¶ 8. Although Smith noticed some improvement in Burkett's 1992 performance, she found it to be no more than satisfactory work. *Id.*

Burkett points to her own declaration in support of the fact that in 1992 she worked on a project during which she developed a time-saving system for the rapid entry of orders for line cuts. Pls.' Ex. 91, Burkett Decl. ¶ 3. The process she had developed "saved service representatives in the Major Business Account Center over 500 hours of work." *Id.* Smith knew about that work, and said she allowed Burkett to do it even though automation of the line cuts was "above and beyond the work [their] department did." *Id.* ¶ 4. Moreover, just before she was terminated Burkett claims to have developed a solution to a pressing billing problem. Id. ¶ 5. She also claims that in 1992 she "received a number of pieces of electronic mail thanking me for my work, including one from a Vice President of Indiana Bell." *Id.* ¶ 6. Finally, Burkett states that she spent many hours correcting errors made by a co-worker who was retained, and that she answered questions for another co-worker who was retained, and in the process discovered a mistake by that co-worker that would have cost the company thousands of dollars. *Id.* ¶¶ 7, 8. She contends that both of these co-workers were "much younger" than she,

without providing any evidence of their actual ages.

When considered in light of all the evidence in this case, Burkett's attempt to create a factual issue about whether she was discharged for a discriminatory reason fails. She does not offer any evidence that would contradict Smith's opinion of her performance in 1991. She does not deny that she was counseled for poor performance in late 1991, nor does she dispute the fact that Smith did not see more than satisfactory performance in 1992. Instead, she maintains that in 1992 she was able to solve problems and develop systems for large projects, as if that demonstrated superior performance. However, both of the cited successes seem to prove nothing more than that she was performing her job adequately. From June 1991 to her termination in November 1992, Burkett's job duties "concerned billing functions and included working with product managers, computer programmers and clerical support staff." Defs.' App. 91, Smith Aff. ¶ 3. When a new product was ready for release, the product managers had to assemble a team to "address and resolve various issues. Burkett acted as the billing representative on such a team." *Id.* In other words, problem solving and handling billing problems were part of her job. Further, by her own admission she did not inform any supervisor that she had to correct co-workers' errors and frequently respond to their questions. Defs.' Supp.App. 149, Burkett Dep. at 134. Burkett's evidence does not raise a genuine issue of material fact about her discrimination claim.

■ Plaintiff Dale Cotterman ("Cotterman") was forty-two years old when he was discharged, and he offers his own deposition, declaration, and 1990 performance evaluation in support of his claim. *See* Pls.' Exs. 95, 96, 97. His evidence consists of his own assessment that he was more knowledgeable than most of his peers, the fact that he had received satisfactory performance evaluations in 1990 and 1991, and that he received regular lump sum merit pay awards. Pls.' Ex. 96, Cotterman Decl. ¶¶ 3, 7, 10; Ex. 97, 1990 Perf. Eval., Ex. 95, Cotterman Dep. at 36–7, 42–3. Defendants point out that no Salary Grade 3 manager in Cotterman's work group received an unsatisfactory rating in 1990 and 1991. Defs.' App. 88, Porento Aff. ¶ 3. Also, Cotterman admitted during his deposition that other employees in his work group had more specialized knowledge about the various technologies used than he, stating that his knowledge was more general and he did not work in the detail that some others did. Defs.' Supp.App. 150, Cotterman Dep. at 71. Cotterman's evidence does not raise a genuine issue of material fact about pretext.

■ At forty-six years old, Beverly Hayes ("Hayes") was the oldest person in her work group. Pls.' Ex. 100, Hayes Dep. at 94. In addition to citing her prior performance evaluations, her own assessment of her skills, and the amount of merit pay she had received, Hayes offers an article that was written about the fact that she was among the first of ASI's employees to work from her home. Pls.' Ex. 102. When the article was published, Hayes had been telecommuting from home for approximately six months. *Id.* According to Hayes' supervisor, Anthony LaCrosse, who represented her at the ranking session, Hayes was criticized by two other members of the ranking committee for not performing her job duties as well as others when they worked with her in 1991. Defs.' App. 81, LaCrosse Aff. ¶ 12. They also said she was often unavailable at work and she was not productive when working at home. *Id.* Hayes takes issue with their characterization of her performance and productivity, citing the reasons why she was often away from her desk, and the fact that neither of the men who criticized her supervised her while she was working from home. Pls.' Ex. 101, Hayes Decl. ¶¶ 3, 4. She also points to a specific project she completed ahead of schedule from home. *Id.* ¶ 5.

However, she does not contest the fact that they made these statements during the ranking session, nor does she have any evidence that anyone on the committee knew the statements were false. The negative comments would certainly explain why the committee ranked Hayes lower than others. Finally, Hayes asserts that it is "incredible that ASI would feature [her] in an employee newsletter designed to encourage other employees to work at home, if district level management really thought she was not pro-

ductive in that program." Pls.' Brief in Oppos. To Mot. For Sum. J. On Individual Clms. at 44. The fact that she was one of the telecommuting employees that was interviewed for that article in 1991, does not invalidate or disprove any perception by the committee that in 1992 she was not working as well in that program. Even if all of Hayes' assertions were true, they still would not add up to evidence showing that ASI did not honestly believe that it terminated her because of her relatively lower ranking during the CRESP evaluation session than those with whom she was evaluated. None of Hayes' evidence suffices to create a genuine issue of material fact on pretext or discrimination.

■ Susan Holdeman, who was forty-four when she was discharged, reports that she was placed in a CRESP ranking group along with people who had technical skills that she did not share, and was then criticized for not having good technical skills. Pls.' Ex. 106, Holdeman Decl. ¶ 5. In support of this assertion she cites her own declaration in which she reports that her boss told her that she was ranked with all technical people. *Id.* Holdeman admits that she did not possess a high degree of technical skill but states that her job did not require such skills. *Id.* She also points out that a co-worker who was in his twenties and who was retained, was "plainly less qualified" than she. Holdeman Decl. ¶ 8. However, she bases that assessment on an assumption she made that he was incapable of completing a project that was given to her after first being assigned to him. Defs.' Supp.App. 151, Holdeman Dep. at 32–9. In light of the analysis already performed on similar offerings by other plaintiffs, the Court finds that none of this evidence raises a factual issue about Holdeman's termination.

■ Plaintiff Thomas Howley, who was fifty-four when he was discharged, complains that he was unfairly blamed for the fraud of a couple of drivers in his line of command. He cites his own declaration and deposition testimony in support of his claim of discrimination. *See* Pls.' Exs. 111, 110. He notes that his performance evaluations in 1990 and 1991 were satisfactory, and that he received a lump sum merit award in 1990. Pls.' Ex. 111, Howley Decl. ¶ 4. According to Howley, he was not the immediate supervisor of the truck drivers who had fraudulently represented the type of vehicle they drove in order to collect additional pay for their work. Pls.' Ex. 111, Howley Decl. ¶ 7; Pls.' Ex. 110, Howley Dep. at 12. Because their immediate supervisor did not report the fraud to Howley, he contends he should not have been investigated or punished for it. *Id.* However, Howley's supervisor did not agree with Howley's interpretation of his role as a supervisor.

In his affidavit, Richard Rankin stated that Howley was a "transship manager" for Indiana and Springfield, Illinois, and as such he supervised several other management employees, each of whom supervised approximately seventy-five craft workers, such as truck drivers. Defs.' App. 65, Rankin Aff. ¶ 5. Two of the truck drivers in Howley's line of authority had falsely reported the type of truck they were driving, and for more than a year they collected an extra amount of pay for each day they reported working in that type of truck. *Id.* ¶ 6. Rankin investigated the incident himself, and found that the immediate supervisor had not adequately checked the time sheets the drivers submitted. *Id.* He also found that Howley had not implemented adequate checks and balances to prevent this type of fraud. *Id.* The fact that Howley and his supervisor do not agree on the extent of his responsibility in this matter does not give rise to an inference of age discrimination. No evidence has been presented that creates a genuine issue of material fact about pretext in relation to the explanation for Howley's discharge.

■ Plaintiff Thomas Hunter was forty-seven years old when he lost his job from ASI. Like the other plaintiffs, Hunter points to his 1990 and 1991 performance evaluations to show that his 1992 CRESP evaluation was a pretext for age discrimination. *See* Pls.' Exs. 115, 116, 117. Like the others, this argument fails. He also contends that his younger peers were all less experienced and knowledgeable than he, offering only the fact that at one time he trained one of them. Pls.' Ex. 116, Hunter Decl. ¶¶ 6, 7, 8. Hunter claims that he did not know any of the people on his CRESP ranking committee. *Id.* ¶ 12. However, Sappenfeld wrote Hunter's 1991

performance evaluation, in which he was rated as satisfactory, and it is implausible that Hunter did not know Sappenfeld, who was on his ranking committee. Sappenfeld indicated that Hunter did not do any more work than was asked of him, unlike his peers who asked for additional work. Defs.' App. 90, ¶ 7. Sappenfeld also states that Hunter was not as innovative as some of his peers in finding new ways to perform his work. *Id.* Naturally, Hunter disagrees with this evaluation, but that fact does not mean that Sappenfeld did not honestly believe in his assessment of Hunter, or that the decision-makers did not rely on the information presented at the CRESP ranking session.

■ Hunter has also pointed out that there may have been a mistake made about which employee named Hunter was supposed to be terminated. The "Hunter" listed in defendants' exhibits is a Thomas G. Hunter, whereas plaintiff is Thomas E. Hunter, and the social security number listed is not the same as plaintiff's. *See* Defs.' App. 63, Ex. E; Pls.' Ex. 117, 1991 Perf. Eval. Unfortunately for Hunter, even if he was placed in the CRESP ranking process by mistake, that fact does not violate the ADEA. Unless he can offer some other evidence of bias, this erroneous placement does not suffice to create a factual issue. Once the employer gives a non-discriminatory reason for the discharge, in this case Hunter's relatively lower ranking during the CRESP process, it is not up to the court to decide if that reason was "wise, fair, or even correct," so long as it was the real reason for the plaintiff's termination. *Giannopoulos,* 109 F.3d at 411. Hunter has failed to present evidence that would lead to a finding that ASI did not honestly believe in the stated reason for his discharge.

Another claim of mistaken identity has been lodged by J. Raymond Jones ("Jones"), who was forty-five when he was discharged. In support of his claim of discrimination, Jones offers his own declaration, in which he states that he had satisfactory performance reviews in 1990 and 1991, and that he received a lump sum merit award in 1991. Pls.' Ex. 121, Jones Decl. ¶ 2, 3, 4. In addition, he reports that his ASI supervisor at the time of his discharge had told him he was in line for a merit award for service in 1992 as well. *Id.* ¶ 10. However, even if his supervisor did tell Jones that he was recommended for a merit pay award in 1992, Jones offers no evidence that the supervisor told that to Jones' CRESP ranking committee. Nor is there any evidence that such a recommendation was actually given, except for Jones' own recollection of a comment by his supervisor.

Instead, Kent Kledzik, who was director of the department Jones was in, stated that he kept in regular contact with Jones' supervisor, he reviewed and signed Jones' performance evaluations, and he had observed Jones' work. Defs.' App. 78, Kledzik Aff. ¶ 4. During both 1991 and 1992, Kledzik reports, he had received complaints about Jones from Indiana Bell Business Office personnel, and from another manager in the department. Kledzik relayed his impressions of Jones and of his work to the ranking committee, and their vote placed Jones near the bottom of the list of his ranking group. The Court has already ruled in other plaintiffs' cases, and now rules in this one, that evidence like Jones has offered does not suffice to create a factual issue on the subject of whether defendants' explanation for his discharge is pretextual.

■ Another tactic used by Jones, and some of the other plaintiffs, has been to compare himself with other members of his work group in terms of age, performance, and termination status. *Id.* ¶ 6. In Jones' opinion, his performance was "superior to that of those retained," which means that defendants must have fired him because of his age. Pls.' Brf. On Indiv. Clms. at 51. He supports this contention with reports about the deficiencies of some of his younger co-workers (although how much younger, the Court cannot tell), but fails to state whether any of these problems were brought to the attention of the decision makers. Moreover, an important aspect of the resizing program that plaintiffs who make this comparison miss, is that ASI had employees performing similar job functions in five states, which means that a person in a department in one location may be compared to someone doing the same type of work in another. In fact, an employee from a work group in a given location could have been assigned to a

CRESP group containing none of his or her immediate co-workers. In addition, the plan behind the resizing contemplated reorganizing some of the previous work groups into more regionally focused groups. *See* Pls.' Ex. 31, Ameritech Announcement dated Aug. 23, 1993; Ex. 41, Weiss Dep. at 45–50; Ex. 50, Reiman Dep. at 226–27, 230, 232–34; Defs.' App. 61, Mason Aff. ¶¶ 3, 9, 11.

These facts, and the more regional focus of the company, make it reasonable that ASI would compare some of the workers located in Indiana with workers located in other states, or those from one part of the state with those from other parts. What is important for purposes of this analysis, however, is the opinion the decision makers had about Jones' performance in terms of the CRESP criteria and compared with others in his group. He has offered no evidence to rebut the honesty of their belief that he was one of the weakest members of the CRESP group in which he was placed. Thus, his evidence fails to create a genuine issue of material fact about his claim of discrimination.

Susan Klooze ("Klooze") presented no evidence from which the Court can discern her age, but as the defendants have not raised the issue, it is assumed that she was age forty or above at the time of the discharge. *But see* Defs.' Brf. In Supp. Of Sum. J. On Indiv. Claims at 16. Prior to her CRESP evaluation, Klooze had just taken on new responsibilities in an area with which she was less familiar, and for which she would need to gain additional technical expertise. Pls.' Ex. 125, Klooze Dep. at 65–66; Ex. 127, 1991 Perf. Eval. (stating that Klooze will be required to learn about new programs and meet demands of new clients in 1992, noting that it "will be very challenging" for her). In addition, she had been experiencing a personality conflict with her regularly-assigned partner, that ultimately led to her supervisor moving another worker in to be Klooze's partner on projects. Pls.' Ex. 125, Klooze Dep. at 35 ("I knew I had problems working with her, I didn't trust her"); Defs.' App. 89, Resler Aff. ¶ 3. In his statements to the ranking committee about Klooze, her supervisor at the time of the CRESP evaluation, James Resler, told them that she was a satisfactory worker and technically competent, but that she had difficulty working with team members and accepting responsibility for projects that he thought were in her area of responsibility. Resler Aff. ¶¶ 3, 4, 8, 11.

To prove that her ranking was not based on an honest assessment by the ranking committee of her performance under the CRESP criteria in relation to the other CRESP group members, Klooze offers her own opinion of her relative worth to the company. Pls.' Ex. 126, Klooze Decl. ¶ 6. She also points out that she was quick to volunteer to take on additional duties from retiring workers, she met all the demands of her assigned duties, she received satisfactory performance evaluations, and Resler wrote on her 1991 performance evaluation that her "minor" personality conflict did not affect her work. Pls.' Ex. 127, 125, Klooze Dep. at 38. That latter statement does not necessarily mean that when the company had to discharge the weakest of its managers, Klooze's interpersonal problems would be ignored. The other arguments by which Klooze compares herself to other workers in her work group fail to raise a genuine issue of material fact. The Court has already found such evidence to be insufficient to raise a factual issue about the motives for the relative ranking of a given employee, and Klooze's evidence fares no better.

█ Finally, Klooze reports that in 1991 she had informed her supervisors that she would rather receive a raise in salary than another lump sum merit award for that year. Consequently, she did not receive such an award for 1991, and she suggests that she was thus improperly placed on the Stage II list for further CRESP evaluation. Even if true, this alleged unfair placement does not violate the ADEA. *See Robinson*, 23 F.3d at 1164 ("Misguided and unfair personnel assessments are not actionable under the ADEA unless age played a role in the evaluation."). Klooze's remedy for the perceived injustice of her placement lies elsewhere. She has failed to raise a genuine issue of material fact on pretext or discrimination.

█ Plaintiff Richard Langford ("Langford") was forty-one at the time of his discharge, and he claims that he had received the highest individual merit pay award in his salary grade in the marketing department

for 1990. Pls. Ex. 134. Even if true, that fact has little bearing on the evaluation he received in 1992 by a CRESP ranking committee using specific criteria for the CRESP process. As other support for his claim that the explanation given for his termination was pretextual, Langford offers his own declaration, his deposition testimony, his bonus record, a declaration by Wertheimer, a letter memorializing an award given to the team on which he worked, and his 1991 performance evaluation. *See* Pls.' Exs. 130, 132, 133, 134, 134A. Of those documents, the only issue that varies from what other plaintiffs have already unsuccessfully raised, is the issue of whether Langford was "mechanically ranked" by objective merit pay information in the lower one-third of his salary grade. According to Wertheimer, who reviewed the merit pay information for that salary grade, Langford ranked at the forty-fifth or fiftieth percentile. Pls.' Ex. 134A. He accuses ASI of not explaining how he ended up on the atrisk list for Stage II evaluation.

A. Steve Roberts, however, offers an explanation. He was director of pricing in ASI's marketing department in the fall of 1992, reporting directly to Robert Ligett, who was the department's general manager of product managing and planning. Defs.' App. 66, Roberts Aff. ¶ 2. Langford was a salary grade 5 manager in Ligett's area of the marketing department, and Roberts was his direct supervisor. *Id.* ¶¶ 14, 19. During the 1992 Stage II CRESP ranking session, Roberts represented Langford and he gave a presentation on Langford's 1992 job performance, skills and abilities. *Id.* Ligett was also a member of Langford's ranking committee, as was another manager familiar with Langford's work. *Id.* ¶ 19. Both Ligett and the other manager spoke negatively about Langford's recent job performance, his "lack of leadership," and his "inability to complete his work on schedule." *Id.*

Langford had been assigned to work on a project directly with Ligett in 1992, and he reports having been disappointed in Langford's work. Defs.' App. 68, Ligett Dep. at 170, 172–73. Ligett originally gave Langford "some pretty important tasks," but it took him an "inordinately long period of time for some of the things to get done." *Id.* In addition, early in the project Ligett recalls that Langford did some things well, but then his performance deteriorated. *Id.* The result was that Ligett was left frustrated and disappointed. *Id.* at 173. The final ranking sheet for Langford's CRESP ranking group contained comments about the results, including a comment that "changes from the mechanical ranking resulted from the multiple team member voting. Major changes were ... R. Langford—lack of leadership and not completing work on schedule for areas discussed which lowered his ranking." Defs.' App. 66, Roberts Aff., Ex. B. Langford has offered no evidence to rebut Ligett's testimony about his disappointment in Langford's 1992 performance, or Roberts' testimony that Ligett spoke negatively about him during the Stage II ranking session. Thus, he has failed to cast any doubt on the motive behind the ranking committee's assigning him a relatively lower rank. Ample proof was presented to explain his selection for Stage II ranking and the outcome of that evaluation, and Langford's evidence has not created any genuine issues of material fact on his individual claim.

■ Plaintiff Connie Murello–Todd was forty-four years old when she was discharged from her position as manager of access services staff, under the supervision of Linda Ullo. Defs.' App. 83, Lockwood Aff. ¶ 4. Her previous supervisor had been Judith Armes, until February 1992. *Id.;* Pls.' Ex. 135, Todd Dep. at 26; Ex. 137, 1991 Perf. Eval.; Defs.' App. 15, Todd Dep. at 44. Todd cites her performance evaluations for 1990 and 1991 as evidence that she was improperly ranked by the Stage II process, and she attributes age discrimination as the motive for her low rank. She also cites the fact that she regularly attended training sessions and she had received compliments for her work and community involvement. Pls.' Ex. 138. Todd transferred from Indiana Bell to ASI in 1991 and she worked providing support to the Customer Service Centers. Defs.' App. 83, Lockwood Aff. ¶ 6. In her 1991 evaluation the only area listed as needing improvement was to expand her responsibilities regionally, according to Todd. Pls.' Ex. 137.

However, defendants point out that the 1991 performance evaluation also contained

several pages of hand-written notes from her supervisor at the time, in which Armes wrote that Todd needed to "improve her attendance which also will improve her standing with her peer group." *Id.* Armes noted that Todd had used eight and one-half sick days in 1991, and that periodically she called in to take days off, rather than schedule them ahead of time. *Id.* She also tended to leave the office early at times. Armes observed that these habits gave the impression of less than the desired amount of dedication to the job. *Id.* Todd also admits that she was warned in her 1990 evaluation about her frequent tardiness. Pls.' Ex. 135, Todd Dep. at 28–29; Defs.' App. 15, Todd Dep. at 28–30. Todd does not dispute the facts underlying these criticisms of her, and she admits that she had a personality conflict with Armes. Defs.' App. 15, Todd Dep. at 43. Instead she seems to argue that it was not enough to offset her performance evaluations, her awards and recognition for community service, and her own opinion that she was mistreated because of her age.

Todd was represented at the Stage II CRESP ranking session by her supervisor's supervisor, Michael Lockwood, who stated that he kept in regular contact with Ullo about the performance of her "direct reports." Defs.' App. 83, Lockwood Aff. ¶¶ 5, 9. According to Lockwood, before the ranking session he met with Armes and Ullo to discuss Todd's work performance, skills and abilities in connection with the CRESP criteria. *Id.* ¶ 12. Based on that discussion, her 1990 and 1991 performance evaluations and merit treatment, and an assessment of her in terms of the CRESP criteria, Lockwood prepared an information sheet on Todd for presenting to the ranking committee. *Id.* The outcome of the ranking session left Todd near the bottom of the ranking group and she 'was discharged. She has presented no evidence to rebut defendants' decision, nor to raise a genuine issue of fact regarding pretext.

██ In support of her claim, plaintiff Carlis Williams ("Williams") cites her own declaration, her 1990 and 1991 performance evaluations, letters from customers, and a letter seeking a transfer for her because of her lack of technical skills needed for the job to which she was assigned. *See* Pls.' Ex. 151, 152, 153, 154, 155. She was forty-one at the time of her discharge, and had been working since April 1992 for a technical computer programming group. · Pls.' Ex. 151, Williams Decl., ¶ 6; Defs.' App. 79, Kreucher Aff. ¶¶ 3,4; Pls.' Ex. 154. She had been seeking a position in human resources, but because there were no openings she had been assigned to "special projects," including the technical computer group. Pls.' Ex. 151, ¶ 6. At the time of the resizing she was actively seeking a position in the Chicago division, and was about to receive an interview when she was told that no out-of-state transfers would be allowed. *Id.* ¶ 7.

Williams admits she was not suited for the position in which she was working at the time of the resizing, but argues that defendants deliberately assigned her to that area knowing she lacked the technical skills needed to do the job. *See* Pls.' Ex. 154, Letter. In the referenced letter dated December 9, 1991, manager Jerry Troxel indicated that he was losing two good people as a result of a company-wide early retirement offer, and that he needed someone with business analysis skills and a technical background to replace them. *Id.* He wrote that Williams was in his group due to an earlier reorganization, and she was "not the best fit for [his] organization." *Id.* Troxel offered to trade Williams, who has an extensive background in psychology, social psychology, counseling and guidance, and whose training and experience had never been capitalized by Indiana Bell, for a technical person. *Id.* The trade did not occur before the resizing program took effect.

While the Court is not unsympathetic to the plight in which Williams found herself at the time she was evaluated, it cannot find any evidence that she was put in this position because of her age. Williams also offered no evidence that members of her ranking committee were aware of her mis-placement within the organization. The reasons given for her low rank, and ultimate discharge, were the fact that she needed to improve in a variety of technical skills, and that when she had worked on a project with Ron Kreucher, she "was not sufficiently knowledgeable about the subject matter to provide a prompt and thorough report." Defs.' App. 79,

Kreucher Aff. ¶ 7. Kreucher was the marketing director responsible for her last assigned area, and he represented her in the CRESP ranking session. *Id.* ¶ 11. None of this evidence creates any doubt that the rankers did not honestly believe they had accurately ranked Williams in relation to the others in her group.

■ Darla Worton ("Worton") was forty-one at the time of her discharge from the marketing department at ASI. Until late Spring, 1992, Worton worked in the engineering department of Indiana Bell, where she performed tasks that required written and oral communication skills, taught computer classes, supervised nine non-management personnel, moderated conferences, and wrote and acted in skits during department and work group meetings. Pls.' Ex. 141, Worton Decl., ¶ 2. In early 1992, her position in engineering was downgraded, and while she was appealing that decision she was offered a position in marketing, which she accepted. Her job in marketing involved learning about new products, then promoting them and providing training to service representatives. *Id.* ¶ 5. In early September, 1992, Worton and others were asked by their supervisor to submit a "statement of accomplishments" for use in the resizing process. *Id.* ¶ 6. She included in her statement the fact that she had been "affiliated with Avon Products for approximately ten (10) years." *Id.* ¶ 7. She considered her work in the marketing department to be similar to that work. *Id.* She also told about her involvement as the Indiana Bell representative to the Junior Achievement Program, in which groups of high school students she had supervised won prizes three years in a row. *Id.* ¶ 8.

Don Peters represented Worton in her CRESP ranking session, and he reported to the group that she had come to the marketing department with little marketing knowledge or experience, she was introverted, and she did not have many useful or transferable job skills. Defs.' App. 87, Peters Aff. ¶¶ 4, 5. He also said that the other marketing managers in the group had better communication skills or more marketing experience than she. *Id.* ¶ 11. Worton offers no evidence that Peters had ever seen the statement in which she described her Avon and Junior Achievement experiences. Instead, she

claims that her supervisor's indifference to her background was evidence that the real reason for her termination was age discrimination. However, she offers no evidence to show that her supervisor's failure to pass her written statement of her skills on to Peters was anything but negligence or oversight.

In addition, Worton relies on the statistical analyses conducted by Wertheimer to assist in raising an inference of age discrimination. The effort of doing so is misdirected and the result is unavailing. Moreover, Worton has no evidence that would tend to show that anyone in the ranking group knew of her background or spoke positively on her behalf, nor does she offer any evidence comparing her treatment to anyone else with a perceived lack of marketing and communication skills and who was substantially younger than her. Her evidence fails to raise a genuine issue of material fact regarding pretext or age discrimination.

### III. CONCLUSION

Having fully considered the defendants' motions to strike the expert testimony being offered by the plaintiffs, the Court has ruled that the July 17, 1996, motion to strike should be, and hereby is, **GRANTED**. The testimony of experts Wertheimer, Bendick and Seberhagen is inadmissible because it is irrelevant and unreliable. Plaintiffs' industrial psychologist's (Seberhagen's) testimony is also not helpful to the jury, and its probative value is substantially exceeded by its potential for prejudice and confusion. Defendants' December 27, 1996, motion to strike Wertheimer's rebuttal report and corresponding declarations, which plaintiffs submitted in response to defendants' motion for summary judgment, does not demonstrate that defendants were prejudiced by the filing of additional expert reports beyond the deadline set in the case management plan and the Court's earlier order. For that reason, and in light of the Court's ruling on the ADEA summary judgment motions, the defendants' motion to strike is **DENIED**.

The plaintiffs filed an unusual motion on July 19, 1996, to have the Court "adjudicate" certain facts they contend are material and uncontroverted, and to rule on which facts

are subject to good faith controversy. The Court has already done so in the process of rendering its decision on the pending motions for summary judgment, and thus finds plaintiffs' motion to have been rendered moot by this order.

Finally, the Court has fully considered all of the evidence, arguments and issues raised by the plaintiffs' claims that defendants engaged in a company-wide pattern or practice of age discrimination, and has found the defendants' motion for summary judgment on this claim to be well-taken. Thus, the July 17, 1996, motion for summary judgment on the pattern or practice claims of the plaintiffs, individually and as a class, is hereby **GRANTED**. Likewise, the Court has fully considered the evidence, arguments and issues raised in connection with the individual claims of age discrimination, and has found that no genuine issue of material fact exists with respect to any of the individual claims of the seventeen named plaintiffs that remain in this action. For that reason, defendants' July 17, 1996, motion for summary judgment on the individual claims under the ADEA is **GRANTED**. Thus, Counts III and IV of the amended complaint should be **DISMISSED**.

Upon careful review, the Court has noted that the only claims or issues that remain pending in this action after the entry of this order and a companion order on defendants' motion to reconsider the Court's March 19, 1997, decision on the ERISA § 510 claims, are those of plaintiffs' Sheila Shorts and Thomas Hunter regarding their pre-termination wages.[24] However, the vacation pay claims of plaintiffs Shorts and Hunter are severable from the remaining claims in this matter, and the Court finds that there is no just cause for delay in entering judgment for the defendants on all claims except for these last two. Although the issue of the validity of the waivers signed by some of the plaintiffs was decided against the defendants, that decision is without effect now that the Court has ruled against the plaintiffs on all of their

ERISA and ADEA claims. Judgment should be entered accordingly.

---

24. On January 15, 1997, the Court found that a genuine issue of material fact existed concerning Hunter and Shorts' claims for untimely payment of vacation pay. Therefore, the Court denied Defendants Ameritech and Indiana Bell's motion

for summary judgment as to these two plaintiffs. The defendants' motion for summary judgment was granted as to all remaining claims in Count IX of the Complaint.